PEOPLE v GUAJARDO

Docket No. 306213. Submitted October 2, 2012, at Lansing. Decided
    March 19, 2013, at 9:10 a.m.
        Juan M. Guajardo, Jr., was convicted by a jury in the Saginaw Circuit
    Court, Robert L. Kaczmarek, J., of second-degree murder, posses-
    sion of a firearm by a felon, and two counts of possession of a
    firearm during the commission of a felony. He appealed, alleging
    that the court erred when it refused to instruct the jury on the
    affirmative defense of self-defense and the defense of others.

        The Court of Appeals *held*:

        1. A defendant asserting an affirmative defense must produce
    some evidence on all elements of the defense before the trial court
    is required to instruct the jury regarding the affirmative defense.

        2. The Self-Defense Act (SDA), MCL 780.971 *et seq.*, codified
    the circumstances in which a person may use deadly force in
    self-defense or in defense of another person without having the
    duty to retreat. The SDA requires that a person have an honest
    and reasonable belief that there is a danger of death, great bodily
    harm, or sexual assault in order to justify the use of deadly force.
    MCL 780.972(1). The SDA also provides that an individual who
    has not or is not engaged in the commission of a crime at the time
    he or she uses deadly force may use deadly force. MCL 780.972(1).
    The SDA does not diminish an individual's right to use deadly
    force or force other than deadly force in self-defense or defense of
    another person as provided by the common law of Michigan on
    October 1, 2006, the effective date of the act.

        3. At common law, felons in possession of a firearm were not
    precluded from asserting self-defense if the defense was supported
    by sufficient evidence, i.e., evidence that the defendant's criminal
    possession of a firearm was justified because the defendant hon-
    estly and reasonably believed that his or her life was in imminent
    danger and that it was necessary to exercise force to protect
    himself or herself. The Legislature did not alter the availability of
    self-defense under the SDA for felons possessing firearms.

        4. A felon possessing a firearm is not precluded from raising
    self-defense under the SDA when there is evidence that would

allow a jury to conclude that criminal possession of a firearm was justified because the accused had an honest and reasonable belief that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault to the accused or to another.

5. There was no evidence that would have allowed a jury to find that defendant's criminal possession of the firearm was justified by an honest and reasonable belief that it was necessary for him to use deadly force to prevent imminent death or great bodily harm to himself or to another. The reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor. An ordinarily prudent and intelligent person would not have found defendant's belief regarding the use of deadly force reasonable. The use of deadly force by defendant was not reasonable because threats of future harm do not constitute imminent danger for purposes of self-defense. Defendant was the aggressor who initiated the deadly confrontation and he was not entitled to a self-defense instruction.

6. Defendant did not advance a self-defense theory at trial but instead claimed that the shooting was an accident. The trial court did not abuse its discretion when it instructed the jury consistently with defendant's accident theory but declined to provide a self-defense instruction.

Affirmed.

1. CRIMINAL LAW — JURY INSTRUCTIONS — AFFIRMATIVE DEFENSES.

A defendant asserting an affirmative defense must produce some evidence on all elements of the defense before a trial court must instruct the jury regarding the affirmative defense.

2. CRIMINAL LAW — AFFIRMATIVE DEFENSES — FELON IN POSSESSION OF A FIREARM — SELF-DEFENSE ACT — COMMON LAW.

Felons in possession of a firearm were not precluded under the common law from asserting the affirmative defense of self-defense if the defense was supported by sufficient evidence; the Legislature did not alter the availability of self-defense under the Self-Defense Act for felons possessing firearms (MCL 750.224f; MCL 780.971 *et seq.*).

3. CRIMINAL LAW — AFFIRMATIVE DEFENSES — FELON IN POSSESSION OF A FIREARM — SELF-DEFENSE ACT.

A felon possessing a firearm is not precluded from raising the affirmative defense of self-defense under the Self-Defense Act

when there is evidence that would allow a jury to conclude that criminal possession of the firearm was justified because the accused had an honest and reasonable belief that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault to the accused or to another (MCL 750.224f; MCL 780.972[1]).

4. CRIMINAL LAW — SELF-DEFENSE — DEADLY FORCE.

The reasonableness of a person's belief regarding the necessity of using deadly force in self-defense or the defense of another depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor.

5. CRIMINAL LAW — SELF-DEFENSE — THREATS OF FUTURE HARM.

Threats of future harm do not constitute imminent danger for purposes of the affirmative defense of self-defense.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Michael D. Thomas*, Prosecuting Attorney, and *Randy L. Price*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*) for defendant.

Before: RONAYNE KRAUSE, P.J., and BORRELLO and RIORDAN, JJ.

BORRELLO, J. Defendant appeals as of right his convictions by a jury of second-degree murder, MCL 750.317, possession of a firearm by a felon, MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a second-offense habitual offender, MCL 769.10, to 25 to 40 years' imprisonment for the second-degree murder conviction, 5 years to 90 months in prison for the conviction of possession of a firearm by a felon, and 2 years' imprisonment for each felony-firearm conviction. For the reasons set forth in this opinion, we affirm.

## I. FACTS

Defendant's convictions arise out of the shooting death of Kevin Powell that occurred about December 17, 2010. The shooting occurred at a boarding house in Saginaw that defendant had signed a contract to purchase a few days earlier. Powell, who was a large, heavyset man, was a tenant at the boarding house. Several days before the shooting, the police refused a request from a man named "Juan" for assistance in evicting Powell because "Juan" could not produce a valid eviction notice. A police officer testified that he told "Juan" to call the police if the subject, i.e., Powell, became "assaultive." The officer testified that "Juan" responded by stating that no call would be necessary because "he takes care of his own." Defendant testified that his friend had made the call and impersonated defendant.

At trial, evidence showed that defendant and Powell engaged in several verbal altercations in the months and days preceding the shooting. Defendant testified that he initially met Powell in the parking lot of a grocery store where he and Powell argued and Powell allegedly stated, "I'll go get my gun and I'll find out who you are." The verbal altercations continued after defendant purchased the boarding house. Defendant testified that Powell was angry that defendant planned to evict all the residents of the boarding house. According to defendant, Powell refused to vacate the boarding house without a refund of his past rent and he allegedly stated, "we shoot cops over here . . . you ain't s--- to me."

Before the shooting, defendant, Delano Williams, and John O'Valle moved some of defendant's belongings, including a rifle, into the boarding house. According to defendant, early in the day Powell shouted at him.

Defendant refused to have a conversation with Powell until Powell stopped shouting. Powell retreated to his room. Later that day, defendant and Powell had a calm discussion; Powell offered to talk and have an alcoholic drink with defendant in his room provided that defendant purchase the alcohol. Defendant agreed, and left the boarding house to purchase alcohol. There was conflicting testimony regarding the events that followed.

According to Williams, after defendant left the boarding house to buy alcohol, O'Valle and Powell got into an argument. O'Valle became angry and retrieved defendant's rifle, which had been placed in a back bedroom. As O'Valle carried the rifle down a hallway toward Powell's room, Powell confronted O'Valle and took the rifle away from him. Powell brought the rifle into his room.

Following the dispute between O'Valle and Powell, according to Williams, he and Powell quarreled over Williams' missing watch. Williams explained that the incident occurred in Powell's room and he stated that Powell started to choke him. Williams testified that while Powell was choking him, defendant returned from the store, and that Powell released Williams when he saw defendant approach. Williams stated that defendant went and "got the rifle back" about 10 to 25 minutes after Powell choked him. Specifically, Williams testified that defendant went into Powell's room, and, following a conversation, Powell handed the rifle back to defendant and told defendant to "control his peoples."

Williams testified that after defendant retrieved the rifle from Powell, defendant placed it in a back bedroom underneath a mattress. According to Williams, sometime thereafter, while he and O'Valle sat at a table,

defendant got the rifle from underneath the mattress, walked to Powell's room, knocked on the door, asked Powell if he wanted some soup, and then fired the gun. Specifically, Williams explained, "I heard the door go, you know, like somebody touched the knob and gonna pull it open and then just heard a bang." Williams was unclear about the timing regarding when defendant stowed the rifle under the mattress after Powell gave it back to him and the time when defendant got the rifle back out from under the mattress and shot Powell. At one point, Williams stated that the shooting occurred about an hour after defendant placed the rifle under the mattress. Williams did not clarify why defendant confronted Powell with a rifle other than stating that Powell "went too far when he decided he wanted to touch me" and that Powell was "too big." He agreed that defendant "got up from the table" unannounced, got the rifle, and went to Powell's room with it.

Defendant's testimony differed from Williams' testimony. Defendant testified that, when he returned to the boarding house from purchasing alcohol, he witnessed Powell laying over O'Valle holding a rifle. Defendant stated that Powell brought the rifle into his room. Defendant went into Powell's room and conversed and drank alcohol with Powell for approximately 15 minutes then arose to leave the room. Powell handed the rifle to defendant as he left the room.

According to defendant, sometime after he and Powell conversed, while he was eating with O'Valle, he heard a "ruckus in the kitchen" and then saw Powell choking Williams. Defendant explained that he instructed Powell to release Williams and Powell complied. However, defendant testified that Powell stated, "that's it ... I'm getting my gun. I'm killin' all of yous. ... He said he was gonna kill us." Powell left the

area and returned to his room. Defendant testified that, as Powell was going to his room, "I went under the mattress and retrieved the gun and flashes of my dead sister was in the kitchen, and I'm seeing flashes of [Williams] dead in the kitchen, and I'm figuring he's gonna come kill us all." Defendant testified that he retrieved the rifle about three minutes after Powell went into his room. Defendant then proceeded to Powell's room with the rifle. Defendant stated that he asked Powell if he wanted some food and proceeded through the door into Powell's room. Defendant testified as follows:

> I was scared that I was going to catch a bullet, you know, through the door, and then when I went into the bedroom, I was what the hell is wrong with you. And then he saw the gun in my hand. He says I got a gun too, mother f-----. And I says well you better not move.
>
> \* \* \*
>
> . . . And that's when he moved this hand. He had something in his hand right here. But I figured he had two guns. And he moved this hand. As he moved, I stepped back and I brought the gun up like this. Now the door is in between halfway him and me. And at the same time when I brought it like this, after he moved, the gun just went off. I mean, it don't just go off, but I don't remember squeezing the trigger. It just happened so fast. And, I mean, I didn't aim for him.

Defendant testified that he was scared of "gettin' killed." He explained that Powell was holding a "long black thing" that looked like the barrel of a gun when he went in Powell's room. However, defendant testified that Powell was "bluffing" and must have been holding a hammer that the police later found on his bed. Defendant testified that his rifle fired only once and he stated that he was "shocked that it went off. I actually

thought that it was empty." He explained that he brought what he thought was an unloaded rifle to Powell's room to try and intimidate Powell and prevent him from "get[ting] his gun and kill[ing] all three of us like he said he was gonna do." Defendant agreed with the prosecution that his "sworn testimony to this jury was that this was an accident taking place at a time that you were in fear for your life." Defendant testified that, immediately after the shooting, he concluded that Powell was dead and he, Williams, and O'Valle placed some belongings and the rifle into a wheelbarrow and fled to a home nearby.

The police were called to the boarding house the following day, where they discovered Powell's body covered with some bedding. The police found a hammer on Powell's bed and a spent shell casing on the floor near the door next to Powell's room. Shortly thereafter, the police arrested defendant.

At the close of proofs, defense counsel requested an instruction on self-defense and the defense of others, but the trial court denied defendant's request and explained:

> With regard to the self-defense claim here, what little research we can do on this matter, there's the idea of accidental self-defense . . . you have to have a rational view of the facts to support this.
>
> In this case, the defendant has testified that the gun accidentally went off. It wasn't his intent to kill the person. He went there with the weapon because of the position he was in because he was frightened but the gun accidentally went off. So the very nature of discharging a firearm in defense of himself or others would not apply, and the fact that he went to the decedent's room would negate it anyway. I believe that more importantly his statement that the gun accidentally discharged would eliminate any claim

that this discharge was with the intent to defend himself or someone else, so I'm not going to give the instruction.

The trial court instructed the jury on the defense of accident. The jury convicted defendant as set forth above. This appeal ensued.

## II. STANDARD OF REVIEW

Defendant contends that the trial court denied him his right to a fair trial when it refused to instruct the jury on self-defense and defense of others.

We review questions of law arising from the provision of jury instructions de novo. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). However, we review a trial court's determination whether a jury instruction is applicable to the facts of a case for an abuse of discretion. *Id.* "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). "The defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). To the extent that we must interpret and apply relevant statutes, issues of statutory construction involve questions of law that we review de novo. *People v Ryan*, 295 Mich App 388, 400; 819 NW2d 55 (2012).

## III. ANALYSIS

### A. GOVERNING LAW

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "A defendant asserting an affirma-

tive defense[1] must produce some evidence on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *People v Crawford*, 232 Mich App 608, 619; 591 NW2d 669 (1998).

Under the common law, the affirmative defense of self-defense justified the killing of another person if the defendant " 'honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' "[2] *Dupree*, 486 Mich at 707, quoting *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002). In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor. *Id.*

In 2006, the Legislature enacted the Self-Defense Act (SDA), MCL 780.971 *et seq*. Effective October 1, 2006, the SDA "codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. Specifically, the SDA modified the common law's duty to retreat that was imposed on individuals who were attacked outside their own home or were not subjected to a "sudden, fierce, and violent" attack. *People v Conyer*, 281 Mich App 526, 530 n 2; 762 NW2d 198 (2008). However, the SDA continues to require that a person have an honest and reasonable belief that there is a danger of death, great bodily harm,

---

[1] "An affirmative defense is one that admits the doing of the act charged, but seeks to justify, excuse, or mitigate it . . . . It does not negate selected elements or facts of the crime." *People v Lemons*, 454 Mich 234, 246 n 15; 562 NW2d 447 (1997) (quotation marks and citations omitted).

[2] At common law, a person could also use deadly force in defense of others under similar circumstances. See *People v Kurr*, 253 Mich App 317, 321; 654 NW2d 651 (2002).

or a sexual assault in order to justify the use of deadly force. MCL 780.972(1). The statute provides, in relevant part, as follows:

> (1) *An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force* may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
>
> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual. [MCL 780.972(1) (emphasis added).]

At the outset we note that a key provision of the statutory language set forth above is that portion which provides "[a]n individual who has not *or is not engaged in the commission of a crime* at the time he or she uses deadly force may use deadly force . . . ." (Emphasis added.) This language raises the question whether a felon possessing a firearm is precluded from asserting self-defense under the SDA. Indeed, in this case, defendant was a convicted felon and was precluded from possessing a firearm under MCL 750.224f at the time of the shooting. Therefore, when defendant possessed the rifle used in the shooting, he was a felon in possession of a firearm contrary to that statute. Accordingly, we must proceed by determining whether a felon in possession of a firearm is precluded from asserting the affirmative defense of self-defense under the SDA.

There is no published caselaw addressing the interplay between the statute proscribing the possession of a firearm by a felon and the SDA; thus, we must first turn

to the plain language of the statutes. MCL 750.224f provides that an individual convicted of a felony may not "possess, use, transport, sell, purchase, carry, ship, receive, or distribute a firearm," unless certain conditions are satisfied. See *People v Perkins*, 473 Mich 626, 630-632; 703 NW2d 448 (2005). The statute includes an exemption applicable to felons who have been pardoned or have had their felonies expunged or set aside. MCL 750.224f(4). However, the statute is silent with respect to affirmative defenses.

With respect to the SDA, as noted, the statute articulates when an individual may use deadly force in self-defense or defense of others with no duty to retreat, MCL 780.972(1), but it too is silent on whether the statute applies to felons possessing firearms. Importantly, however, the SDA provides: "This act *does not diminish an individual's right to use deadly force* or force other than deadly force in self-defense or defense of another individual *as provided by the common law* of this state in existence on October 1, 2006." MCL 780.974 (emphasis added). Thus, in order to resolve whether a felon in possession of a firearm is precluded from asserting self-defense under the SDA, we must proceed by examining the scope of an individual's right to assert self-defense at common law.

In *Dupree*, 486 Mich at 696-697, our Supreme Court addressed whether a convicted felon could assert common-law self-defense to justify his temporary possession of a firearm in violation of the statute prohibiting possession of a firearm by a felon. In that case, the defendant was at a house party with a female companion when he became involved in an altercation with another man, Damond Reeves, on the porch. *Id.* at 697-698. Testimony showed that the altercation escalated into a physical brawl. *Id.* at 698. As the two men

wrestled on the ground, the defendant saw that Reeves had a gun in the waistband of his pants. *Id.* The defendant testified that he was afraid for his life because Reeves was larger than him, intoxicated, and armed. *Id.* at 698-699. The defendant testified that he shot Reeves three times as he struggled with Reeves for the gun. *Id.* at 699. The defendant then fled the scene with the gun, tossing it out of the window of his companion's vehicle after she had driven them away from the house. *Id.*

The prosecution charged the defendant with assault with intent to commit murder, felonious assault, possession of a firearm by a felon, and felony-firearm. *Id.* at 697-698. At trial, the defendant claimed self-defense and he argued that his temporary possession of the gun was justified because he seized it only to protect himself during the scuffle. *Id.* at 699. The trial court provided a standard self-defense instruction; however, with respect to the felon-in-possession charge, the court provided a "momentary innocent possession" instruction. *Id.* at 699-700. The jury acquitted the defendant of all the charges except the felon-in-possession charge and the defendant appealed. *Id.* at 700.

This Court reversed the defendant's conviction and remanded for a new trial, finding that common-law self-defense was available for a charge of being a felon in possession of a firearm and that the trial court had erred by failing to instruct the jury accordingly. *People v Dupree*, 284 Mich App 89, 92, 104; 771 NW2d 470 (2009) (opinion by M. J. KELLY, J.). Writing for the majority, Judge M. J. KELLY reasoned that "the Legislature's enactment of MCL 750.224f must be construed against the background of Anglo-Saxon common law, which includes the defenses of duress and self-defense." *Id.* at 103. Judge M. J. KELLY noted the purpose behind the

felon-in-possession statute "is to ensure that those persons who are more likely to misuse firearms do not maintain ready possession of them." *Id.* at 106. However, Judge M. J. KELLY declined to presume that by enacting the statute, "the Legislature intended to deprive persons—even ex-felons—of the fundamental right to defend against a sudden and potentially deadly attack." *Id.* at 104, citing *United States v Panter*, 688 F2d 268, 271 (CA 5, 1982) ("We do not believe that Congress intended to make exfelons [sic] helpless targets for assassins."). Judge M. J. KELLY concluded, "[b]ecause there is no indication that the Legislature intended to abrogate or modify the application of traditional common-law affirmative defenses to MCL 750.224f, I conclude that the defenses of duress and self-defense are still applicable to a charge of being a felon-in-possession." *Dupree*, 284 Mich App at 104.

Our Supreme Court affirmed this Court's result,[3] holding that common-law self-defense "is generally available for a felon-in-possession charge *if supported by sufficient evidence.*" *Dupree*, 486 Mich at 697 (emphasis added). The Court reasoned that self-defense was "embedded in our criminal jurisprudence," and presumed that the defense was available for felons possessing firearms "[a]bsent some clear indication that the Legislature abrogated or modified" the availability of the defense. *Id.* at 705-706. Importantly, though, the defense was available only if it was supported by sufficient evidence—i.e., evidence that the defendant's "criminal possession of the firearm was justified because defendant honestly and reasonably believed that his life was

---

[3] Our Supreme Court did not affirm this Court's holding that the affirmative defense of duress was available to a felon-in-possession charge because the defense was not properly raised in the trial court. *Dupree*, 486 Mich at 696-697, 703.

in imminent danger and that it was necessary for him to exercise force to protect himself." *Id.* at 708. The Court concluded that the defendant had introduced evidence to support that he possessed the gun in self-defense. *Id.* at 708-709.

*Dupree* clearly establishes that at common law, felons in possession of a firearm were not precluded from asserting self-defense if the defense was supported by sufficient evidence. The Legislature did not alter the availability of self-defense under the SDA for felons possessing firearms. Rather, the SDA explicitly states that the statute *"does not diminish an individual's right to use deadly force* or force other than deadly force in self-defense or defense of another individual *as provided by the common law* of this state in existence on October 1, 2006." MCL 780.974 (emphasis added). Therefore, we hold that a felon possessing a firearm is not precluded from raising self-defense under the SDA when there is evidence that would allow a jury to conclude that criminal possession of a firearm was justified because the accused had an honest and reasonable belief that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault to himself or herself or to another. See *Dupree,* 486 Mich at 708-709; MCL 780.972(1).[4]

---

[4] We note that the temporal relationship between the time the accused came into possession of the firearm and the time he or she deployed deadly force is relevant to determining whether the accused had an honest and reasonable belief that possession of a firearm was justified to prevent imminent death, great bodily harm, or sexual assault. For example, in *Dupree,* 486 Mich at 708-709, a self-defense instruction was warranted when there was evidence that the defendant struggled with an armed individual for possession of the gun and then possessed the gun for a short period thereafter until the threat of danger subsided. Thus, both the amount of time an accused possessed a firearm and the manner in which an accused came into possession of the firearm can be part of a totality-of-the-circumstances inquiry into whether there is evidence that

### B. APPLICATION

Having concluded that a felon possessing a firearm is not precluded from asserting self-defense under the SDA if the defense is supported by evidence, we now turn to whether, in this case, self-defense was supported by the evidence.

After a thorough review of the record, we conclude that there was no evidence that would have allowed a jury to find that defendant's criminal possession of the rifle was justified by an honest and reasonable belief that it was necessary for him to use deadly force to prevent imminent death or great bodily harm to himself or to another.[5] MCL 780.972(1). Here, unlike in *Dupree*, defendant was not involved in a physical struggle with an intoxicated and armed individual. Instead, defendant pursued Powell into his room and shot him after Powell had abandoned the physical altercation with Williams and retreated into his room, a place where he had a legal right to be. Specifically, evidence showed that several physical and verbal altercations preceded the shooting. O'Valle confronted Powell with the rifle, Williams accused Powell of taking his watch, and defendant informed Powell that he would soon be evicted. Despite the contentious nature of the relationship between the men, Powell never produced a weapon or placed any of the men in danger of imminent death or great bodily harm. Indeed, when O'Valle threatened Powell with defendant's rifle, Powell physically took the

---

a felon's possession of a firearm was justified because the felon honestly and reasonably believed that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault.

[5] It was not alleged, and there was no evidence, that there was any danger of sexual assault; thus, our analysis is limited to whether defendant had a reasonable and honest belief of imminent death or great bodily harm.

weapon from him but he did not threaten anyone with it. Instead, Powell returned the rifle to defendant without incident. It was defendant, not Powell, who used the rifle as a deadly weapon.

Additionally, although defendant testified that he feared for his life, there was no evidence that defendant had a reasonable and honest belief that the use of deadly force was necessary to prevent imminent death or great bodily harm. *Dupree*, 486 Mich at 707. The reasonableness of a person's belief regarding the necessity of deadly force "depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011). In this case, considering all the facts and circumstances, an ordinarily prudent and intelligent person would not have found it reasonable to pursue Powell to his room, coax him to open the door by offering him food, and then shoot him. According to defendant, Powell and Williams were in a physical altercation a minimum of three minutes before the shooting. During this altercation, Powell did not possess any weapon and he did not pose a deadly threat to either defendant or Williams. In fact, according to defendant, when defendant put his hand on Powell's shoulder and told him to release Williams, Powell did so and then retreated to his room and closed the door. Although defendant testified that Powell threatened to get his gun and kill all three men, Powell returned to his room and closed the door and did not come back out of the room. Despite defendant's contrary claims, the use of deadly force was not necessary because threats of future harm do not constitute imminent danger for purposes of self-defense. See, e.g., *People v Truong (After Remand)*, 218 Mich App 325, 337-338; 553 NW2d 692 (1996). Once Powell abandoned the physical altercation and retreated to his room and

closed the door, he did not pose an imminent threat to defendant or anyone else in the boarding house in such a manner that the use of deadly force was necessary. Nevertheless, defendant retrieved a rifle from under a mattress in a back bedroom, waited three minutes, went to Powell's room, offered Powell food, and then immediately shot Powell. Indeed, according to his own testimony, defendant did not think the rifle was loaded when he brought it to Powell's room. Had defendant possessed a reasonable and honest belief that his life was in danger, he would not have brought what he thought was an unloaded rifle to Powell's room to confront him. In sum, defendant was the aggressor who initiated the deadly confrontation and he was not entitled to a self-defense instruction.

Moreover, defendant did not advance a self-defense theory at trial. While defendant correctly claims that a criminal defendant can assert inconsistent defenses, *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997), all defenses must be supported by evidence. *Crawford*, 232 Mich App at 619. In this case, a self-defense theory of defense was not supported by any evidence. "A finding that a defendant acted in justifiable self-defense necessarily requires a finding that the defendant acted intentionally, but that the circumstances justified his actions." *People v Heflin*, 434 Mich 482, 503; 456 NW2d 10 (1990). At trial, defendant did not maintain that he intentionally shot Powell in self-defense. Rather, defendant maintained that the shooting was an accident. Specifically, defendant testified that he thought the rifle was unloaded when he brought it to Powell's room and he stated that he was "shocked" that the gun fired. Defendant testified, "I actually thought that it was empty." Defendant explained that he brought what he thought was an unloaded gun to Powell's room in an effort to intimidate him. Defendant

explained how the gun fired as follows: "I brought the gun up like this. . . . And at the same time . . . the gun just went off. I mean, it don't just go off, but I don't remember squeezing the trigger. It just happened so fast." In addition, defendant testified that he did not aim for Powell, and he agreed with the prosecution that his "sworn testimony to this jury was that *this [shooting] was an accident* taking place at a time that you were in fear for your life." (Emphasis added.) Thus, based on defendant's own testimony, there were only two possible outcomes supported by the evidence: (1) defendant intentionally shot Powell without justification as the prosecution argued or (2) defendant accidentally shot Powell as he claimed during his testimony. Accordingly, the trial court did not abuse its discretion when it instructed the jury consistently with defendant's accident theory but declined to provide a self-defense instruction. See *People v Trammell*, 70 Mich App 351, 355; 247 NW2d 311 (1976) (holding that the trial court did not err by refusing to give a self-defense instruction when the defendant argued that his actions were an accident).

IV. CONCLUSION

In summary, we conclude that a felon possessing a firearm is not precluded from asserting self-defense under the SDA when there is evidence that would allow a jury to conclude that the criminal possession of the firearm was justified because the accused had an honest and reasonable belief that the use of deadly force was necessary to prevent imminent death, great bodily harm, or sexual assault to himself or herself or to another. In this case, the trial court did not abuse its discretion when it refused to provide a self-defense instruction because there was no evidence that would

allow a juror to conclude that defendant's possession of a firearm was justified on the basis that he had a reasonable and honest belief that the use of deadly force was necessary to prevent imminent death or great bodily harm to himself or to another and because defendant advanced an accident defense at trial.

Affirmed.

RONAYNE KRAUSE, P.J., and RIORDAN, J., concurred with BORRELLO, J.