*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
February 11, 2020

v

No. 345696
Wayne Circuit Court
LC No. 18-003178-01-FC

RICARDO LEWIS WITHERSPOON,

Defendant-Appellant.

Before: MURRAY, C.J., and SWARTZLE and CAMERON, JJ.

PER CURIAM.

A jury convicted defendant of voluntary manslaughter, MCL 750.321, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In his sole claim on appeal, defendant argues that the evidence was insufficient to support his convictions because the prosecutor failed to prove beyond a reasonable doubt that he was not acting in lawful self-defense when he shot and killed the victim. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that the prosecutor proved, beyond a reasonable doubt, that defendant did not act in self-defense. Therefore, we affirm defendant's convictions and sentences.

## I. BACKGROUND

Defendant, Ricardo Lewis Witherspoon, owned a recording studio on the upper floor of an old furniture building in Redford, Michigan. On December 31, 2017, defendant was present in the studio with several others, primarily to celebrate New Year's Eve. The victim, Deonta Staples, was present with his friend, James Fox. In addition, Dejah Sandusky was present with her mother, Lawanda Sparkling, who had previously been involved in a romantic relationship with defendant.

Defendant had allowed the victim to stay overnight in the studio, as he had done on other occasions. In the early evening, Fox picked up the victim from the studio and they ran an errand. When they returned later that evening to celebrate New Year's Eve, Sandusky and Sparkling were present at the studio. Throughout the evening, the group was talking, listening to music, drinking alcohol, and "having a good time." By all witnesses' accounts, after midnight, the gathering was

winding down and it was quiet. There had been no issues throughout the evening, and the group had enjoyed a good time.

Sandusky testified, however, that she spilled her drink in the recording studio at one point during the gathering. Sparkling testified that, in response to the spilled drink, defendant stated, "you guys got to stop spilling stuff in here," and Sandusky apologized. Sandusky recalled that defendant was "frustrated" because of the spilled drink. Subsequently, Sandusky and Sparkling left the studio to visit the bathroom. When they left, the victim was recording music, Fox was texting on his phone and dozing on a futon, and defendant was either sitting on the couch or at his computer. Sandusky and Sparkling estimated that they were in the bathroom for a period ranging from five to seven minutes.

According to Fox, while the women were gone, the victim came out of the recording booth and defendant "confronted him about having drinks in the booth and spilling a drink in the booth again." The victim verbally responded, and defendant indicated that if the victim did not respect his belongings, he could leave. Fox claimed that, after the men exchanged words, they began "tussling." Because the room was small, it was difficult for the men to throw blows, and they began "grabbing each other, slamming each other around," and "rolling around." When Fox tried to break up the fight, defendant was on top, and Fox attempted to pull him off the victim. The men separated, but had "more words" as Fox stood between them. At this point, Sandusky and Sparkling returned from the bathroom.

Sandusky testified that she opened the door to the studio and, as they were entering, the victim "kind of ran up to the door" and said "give us a second." Sparkling, who was behind Sandusky, heard Fox state similarly, "give us a minute." Sandusky could see inside the studio, and it seemed to her like the men "were very hyped up" and that "something had happened." Sandusky and Sparkling stepped back into the hallway, and the victim closed the door behind them. Sandusky estimated that she and Sparkling were waiting in the hallway approximately four or five minutes. They did not hear anything, and were nervous and concerned about what could be happening in the studio. At one point, Sandusky turned the doorknob, but it did not open. Sandusky believed that it was locked. In contrast, Fox testified that he did not think the door was locked.

There was some indication that Sandusky may have seen defendant holding a handgun during the brief time the door to the studio was open. She saw defendant in the corner of the room, standing straight with his arms to the side, and she saw something shiny in his hand, "like a glare off the ceiling light." She testified that she did not know what defendant was holding, and that it "could have been anything." When asked about her prior testimony, Sandusky denied that defendant was holding a knife, but suggested that he could have been holding some other type of weapon.

Fox, however, testified that defendant did not arm himself with a handgun until after the women stepped back out into the hallway. Fox testified that, after the women left the room, "it got hostile again," and defendant and the victim fought for two or three more minutes. Fox stated that he was trying to break up the fight, and eventually defendant and the victim "just let up" and

separated. At the end of both fights, defendant was on top and he appeared to be winning, but both men had scars and bruises from their fighting. Fox claimed that, while the men continued to exchange comments, defendant walked to the couch and grabbed a gun. This prompted Fox to make a comment about defendant "pulling a gun over a spilled drink." Defendant then told the men to "get the f**k out" of his studio.

Fox stated that he and the victim gathered their belongings as defendant and the victim continued "having more words." Fox stated that he and the victim had "almost made it out" of the studio because they were "close to the door, leaving out" and the victim had "put his coat on, and his hat, he was ready to go." Fox claimed that the victim stated: "I don't know why you want to pull a gun. If you want to fight, I'll come back so we can fight." After the victim made that statement, defendant walked three or four steps, raised the gun, pulled the trigger, and shot the victim once in the head.

Fox testified that he watched as the victim's body dropped to the ground, with blood shooting from his face. It is undisputed that the victim's cause of death was one gunshot wound to the face. According to Fox, defendant appeared to be contemplating what to do next, pacing back and forth with the gun in his hand. Fox claimed that he left the studio because he was concerned about what might happen next. Fox denied that he attacked defendant in any way during the evening.

Sandusky and Sparkling testified that, while they were standing in the hallway, they heard a sound. Sandusky described it as a "clap noise," like a door closing, but Sparkling thought it sounded like a gunshot. After hearing the sound, Sparkling pulled Sandusky down the hallway. The women both saw Fox leave the studio and walk around the corner, without attempting to speak to them. The women then saw defendant exit the studio backward, dragging the victim's motionless body by the legs. The women watched as defendant dragged the body down the hallway, leaving a trail of blood to the building's front entrance. Both women repeatedly asked defendant what had happened, but he did not respond. Defendant did not ask them for assistance and did not ask them to call 911. Defendant left the victim's body by the entrance door, which upset Sparkling because she felt that defendant treated the victim's body "like it was trash." The women chose to leave without calling 911. Although they saw a large number of police cars pulling up at the studio as they left, they chose not to speak to police at that time.

Fox claimed that, when he left the studio, he went to his car, called 911, and armed himself with a handgun that was in his car. Fox testified that he had a concealed-pistol license and that he generally carried a handgun in a holster at his side. Yet, Fox denied that he was carrying the firearm while he was inside the studio on the night of the shooting. He claimed that he left his handgun in a case in the trunk of his car. When asked why he left his weapon in the car that night, he explained that it was New Year's Eve, he planned to be celebrating, drinking, or smoking, and he believed that leaving the handgun in the car was "the most responsible thing" for him to do. During the 911 call, Fox informed the dispatcher of his location and stated that he had a handgun, which he turned over to the police when they arrived. Fox claimed that he mentioned his handgun to the dispatcher because a person with a concealed-pistol license is obligated to immediately inform police that he is armed with a concealed weapon, and he did not want police to think that he was the person who shot the victim.

Fox testified that police subsequently interviewed him at the police station. The defense noted that, during his interview, Fox told the interviewing officer that defendant "just paced around. He didn't say nothing to me because he knew I had my gun with me." Fox denied making the statement, and then testified that he did not recall making the statement. Fox reiterated his claim that he did not have his handgun with him in the studio. Fox admitted that he and the interviewing officer discussed self-defense, and that Fox asked what would have happened if he had shot defendant. Fox explained that he was feeling remorseful, wishing he had done more to prevent the victim's death, and wondering what he could have done if he had possessed his handgun at the time of the shooting.

When police arrived at the scene, multiple people were trying to leave the premises. Two police officers searched the outside of the building and recovered a handgun from one of the dumpsters behind the building. Defendant's fingerprints were found on the handgun, along with the victim's DNA. Defendant did not call 911, and had no contact with the police that night.

Sandusky and Sparkling subsequently returned to the studio because Sandusky had left not only her keys and jacket in the studio, but had also left her car in the parking lot. The women also assumed that the building's surveillance cameras had recorded their presence at the scene. When they approached a police officer about going inside the studio to retrieve their items, they were asked if they knew what had happened, and both women later gave statements at the police station.

The prosecutor charged defendant with first-degree premeditated murder, MCL 750.316(1)(a), for shooting and killing the victim. Defendant presented a self-defense theory at trial. Defendant did not testify or call any witnesses, but the defense highlighted that defendant had been assaulted twice in his place of business, Fox was known to carry a firearm, and the victim had locked the door to the studio when Sandusky and Sparkling attempted to reenter.

The jury rejected defendant's claim of self-defense and convicted him of the lesser offense of voluntary manslaughter, as well as felony-firearm. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 200 months to 60 years' imprisonment for the manslaughter conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction.

This appeal followed.

## II. ANALYSIS

In his sole claim on appeal, defendant argues that the evidence was insufficient to support his convictions because the prosecutor failed to prove beyond a reasonable doubt that he was not acting in lawful self-defense when he shot and killed the victim.

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). When determining whether the prosecutor presented sufficient evidence to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether the trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). "[A] reviewing court is required to draw all reasonable inferences

and make credibility choices in support of the jury's verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

The Self-Defense Act, MCL 780.971 *et seq.*, codified the circumstances in which a person may assert the defense of self-defense. MCL 780.972 provides, in relevant part:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

"[A] defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). "Once a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of disproving the affirmative defense of self-defense beyond a reasonable doubt." *People v Dupree*, 486 Mich 693, 712; 788 NW2d 399 (2010).

Defendant presented a self-defense theory at trial. Although he chose not to testify in his own defense and called no witnesses, defendant presented this theory of self-defense based on others' testimony that, (1) when Sandusky and Sparkling returned from the bathroom, the victim told them to "give us a second" before locking the door of defendant's studio, and (2) defendant was aware that Fox typically carried a gun. On appeal, defendant argues that the "only rational inference" for the jury was that defendant had a reasonable belief that Fox and and the victim "were subjecting him to a sudden, fierce, and violent attack," and that he was not required to retreat from his own studio.

Assuming that there was even enough evidence to support defendant's claim of self-defense, there was also ample evidence to rebut it. Specifically, there was evidence that before confronting the victim about spilling a drink in the recording booth, defendant had admonished Sandusky about the same issue and that he seemed frustrated. From this evidence, the jury could have inferred that defendant was already upset. There was also eyewitness testimony from Fox—the only other person in the studio at the time of the shooting—that he had not attacked defendant in any way and that, in both of the fights, he considered defendant the winner because defendant was on top of the victim. From this evidence, the jury could have inferred that defendant was not subjected to a "fierce, and violent attack." Further, there was eyewitness testimony that defendant and the victim had separated, although they continued to exchange words, when defendant walked to the couch, grabbed his gun, and told them to get out. As instructed, they gathered their belongings and "almost made it out" before defendant reacted to the victim's statement about coming back to fight by walking three or four steps, raising the gun, pulling the trigger, and shooting the victim in the head. From this evidence, the jury could have found that defendant did not honestly and reasonably believe that the victim was an actual threat to defendant's life or safety. The testimony that Fox and the victim were "close to the door, leaving out" and the victim

-5-

had "put his coat on, and his hat, he was ready to go," further supports an inference that this was not a defensive shooting. The jury could have also concluded that defendant responded with force beyond what was necessary to protect himself from death or severe bodily harm.

In addition, there was no evidence that the victim was armed, and Fox testified that he was not armed while in the studio. At trial, defendant challenged Fox's claim that he did not take his handgun into the studio that night. Although Fox offered an explanation for that failure, the jury was free to credit or discredit Fox's testimony. It is not the role of this Court to interfere with a jury's "determinations regarding the weight of the evidence or the credibility of witnesses." *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). Further, even if the jury believed that Fox had his gun in the studio, it was not compelled to find that he or the victim threatened defendant with that gun.

Lastly, contrary to defendant's suggestion, the jury was not prohibited from considering and inferring consciousness of guilt from defendant's actions after the shooting (i.e., dragging the victim's body out of his studio, fleeing the scene, and discarding the firearm in a dumpster). See *People v Dixon-Bey*, 321 Mich App 490, 509-510; 909 NW2d 458 (2017), and *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003). Viewing the evidence in a light most favorable to the prosecutor, a rational jury could have found beyond a reasonable doubt that defendant did not act in justifiable self-defense. Accordingly, the prosecutor presented sufficient evidence to support defendant's convictions of voluntary manslaughter and felony-firearm.

Affirmed.

/s/ Christopher M. Murray
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron