*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 18, 2023

Plaintiff-Appellee,

v

No. 360690
Macomb Circuit Court
LC No. 2021-000163-FC

MICHAEL ANTHONY FRANKS, JR.,

Defendant-Appellant.

Before: LETICA, P.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of voluntary manslaughter, MCL 750.321, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 29 to 180 months' imprisonment for voluntary manslaughter, and 24 months' consecutive imprisonment for felony-firearm. We affirm.

## I. FACTS

On the day of the shooting, defendant and Raven Owens, defendant's girlfriend, were in bed with their children when the decedent, Rashan Johnson (Owens's father), arrived to pick up food Owens had made for him. After coming into the house, the decedent talked with Owens and played with his grandchildren. When defendant came downstairs, the decedent and defendant greeted each other and began discussing sports. After an hour, defendant asked the decedent if he was taking his food to go. The decedent became agitated, and asked defendant if defendant was trying to make him leave. Defendant went over to Owens and asked if she had set him up. After hearing this, the decedent approached defendant within inches and told defendant not to talk to Owens that way. The two men began arguing, and then defendant pushed the decedent, pulled out a gun from his front hoodie pocket, and shot at the decedent seven times, hitting him with four of the bullets—two of which entered the decedent's body from behind. Defendant immediately left the house, but he was apprehended three days later.

Testimony indicated that the decedent had a reputation for being peaceful, kind, and ready to help, but he also had a reputation for being argumentative and aggressive. Defendant had a reputation for being a quiet, peaceful, nonaggressive man who never sought conflict. Defendant

-1-

had always been respectful of the decedent, even when the decedent was disrespectful of defendant. Defendant and the decedent had argued on other occasions, but defendant always defused the situation, as he was known to do. The decedent and defendant never had a physical altercation before the shooting. Others described the interactions between defendant and the decedent as normal and cordial.

Owens testified that the prosecution threatened her to testify in this case. She based this allegation on the fact that the prosecution told her that her children would be forensically interviewed without her present if she did not testify because they were the only other eyewitnesses to the shooting.[1] Owens did not want to testify but was subpoenaed to do so. There was a concurrent Children's Protective Services (CPS) investigation pending when Owens had this conversation with the prosecution.

The jury ultimately found defendant guilty of the lesser charge of voluntary manslaughter in lieu of the original charge of second-degree murder, as well as felony-firearm. This appeal followed.

## II. WITNESS INTIMIDATION

On appeal, defendant argues that his due-process rights were violated when the prosecution threatened Owens into testifying, or, in the alternative, he was denied the effective assistance of counsel when his defense counsel failed to further probe into the intimidation or object to Owens's testimony. We disagree.

"Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Clark*, 330 Mich App 392, 433; 948 NW2d 604 (2019).[2] To show plain error, a defendant must prove "1) an error occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected his substantial rights, meaning it affected the outcome of the proceedings." *People v Jarrell*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356070); slip op at 8-9. "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Bennett*, 290 Mich App 465, 475-476; 802 NW2d 627 (2010) (quotation marks and citation omitted).

Unpreserved claims of ineffective assistance of counsel are reviewable for errors that are apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citation omitted). "All findings of fact are reviewed for clear error, while the legal questions are reviewed

---

[1] Owens did not want her children interviewed without her present given that they were only eight and four years old, respectively, at the time.

[2] We use "prosecutorial misconduct" as a term of art, not suggesting that the prosecution's conduct was illegal or violative of the rules of professional conduct. See *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

de novo." *Id*. (quotation marks and citation omitted). Clear error exists where the reviewing court is left with a "definite and firm conviction" that the lower court made a mistake. *Id*. (quotation marks and citation omitted).

Generally, issues pertaining to witness intimidation are analyzed under the framework of prosecutorial misconduct, and the ultimate "test for prosecutorial misconduct is whether, after examining the prosecutor's statements and actions in context, the defendant was denied a fair and impartial trial." *People v Hill*, 257 Mich App 126, 135; 667 NW2d 78 (2003). "The Michigan Supreme Court and this Court have strongly condemned prosecutorial intimidation of witnesses." *Id*. "Attempts by the prosecution to intimidate witnesses from testifying, if successful, amount to a denial of a defendant's constitutional right to due process of law." *Id*. Remand for an evidentiary hearing can be ordered where a testimonial record must be developed to support a defendant's claim of prosecutorial misconduct. *Id*. at 136.

Here, defendant claims that the prosecution improperly threatened Owens into testifying against defendant. During cross-examination by defense counsel, Owens testified as follows:

> *Q*. Did the prosecutor force you to come in to court today?
>
> *A*. I was subpoenaed.
>
> *Q*. Did you hire a lawyer --
>
> *A*. I did.
>
> *Q*. -- to help you through this process?
>
> *A*. I did.
>
>            \* \* \*
>
> *Q*. Did the prosecution threaten you to testify in this matter?
>
> *A*. Yes.

Immediately after that exchange, the prosecution questioned Owens on re-direct examination about the circumstances of the purported threat:

> *Q*. And you agree, that we've always stressed to you to be truthful during your testimony, right?
>
> *A*. Um-huh. Yes.
>
> *Q*. Okay. So, this threat that you're talking about, that counsel asked you about -- that's the word he used, threat to testify -- did I, or Ms. Fedorak, ever say you must testify or this is going to happen, or something like that?
>
> *A*. You guys brought my kids in to it, yes.

*Q*. Okay. Well, to be clear, you're our only adult witness in this case; you understand that?

*A*. I understand.

*Q*. Okay. And the kids were witnesses, themselves, to what happened; you agree with that, they were there?

*A*. Yes, they were.

*Q*. Okay. And you expressed some reluctance, you agree, to participate in this process, right?

*A*. Because, I was subpoenaed.

\* \* \*

*Q*. Okay. And the -- what you said about bringing kids in to it, there was a -- a CPS investigation; it's fair to say?

*A*. Yes.

*Q*. They got involved, and -- and when you say bringing kids in to it, having a forensic interview done with the kids, having them speak to a professional about what happened that day, that's what you are upset about, right?

*A*. Yes, because my kids were only four and eight, and then you -- you guys were saying that I couldn't be in a room with my -- my kids. My daughter was only four at the time.

Defendant argues that these circumstances suggested to Owens that if she did not testify, the prosecution would advocate for removal of her children in the CPS case. However, Owens's testimony does not suggest that conclusion, nor did Owens testify that she believed that the prosecution would attempt to advocate for removal of her children if she did not testify. Rather, at worst, Owens's testimony suggests that the prosecution "threatened" her with a possible interview of her children without her present. Importantly, the prosecution seemingly would have had no other choice but to interview Owens's children if she refused to testify because the children were the only other eyewitnesses to the shooting. Thus, the suggestion of interviewing Owens's children was not a manipulative threat; rather, it was the prosecution informing Owens of its only alternative course of action if Owens refused to testify. The prosecution is generally permitted to inform a prospective witness about the consequences of failure to cooperate with the legal process. Compare *People v Layher*, 238 Mich App 573, 587; 607 NW2d 91 (1999) ("[A] prosecutor may inform a witness that false testimony could result in a perjury charge.").

Additionally, the prosecution's statements did not influence whether Owens was going to testify in this case because she was subpoenaed to testify, and there is nothing to suggest that she would have disregarded that subpoena. Nor did the prosecution's reference to interviewing Owens's children include a threat for Owens to testify in a certain manner or fabricate her

-4-

testimony. In fact, the prosecution asked Owens if he and the other prosecutor had told her to testify truthfully, and she affirmed that they had. Based on the record, it does not appear that the prosecution's mention of Owens's children changed whether she was going to testify, or the content of her testimony. Accordingly, there is nothing tending to show that defendant was denied a fair and impartial trial. This is particularly true in light of the fact that Owens had her own counsel to assist her with the proceedings. See *People v Clark*, 172 Mich App 407, 414; 432 NW2d 726 (1988) (declining to award relief for the alleged prosecutorial witness intimidation because, in part, "the court took an additional protective measure of assigning counsel to [the witness] and allowing her to fully consult with counsel regarding her testimony"). Therefore, no plain error occurred.

We also conclude that defendant was not denied the effective assistance of counsel. A criminal defendant has the right to a fair trial, which includes the right to effective assistance of counsel. *Isrow*, 339 Mich App at 531. "Trial counsel is ineffective when counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. (quotation marks and citation omitted). "Trial counsel's performance is presumed to be effective, and defendant has the heavy burden of proving otherwise." *Id*. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "If counsel's strategy is reasonable, then his or her performance was not deficient." *Isrow*, 339 Mich App at 532 (quotation marks and citation omitted). "A deficiency prejudices a defendant when there is a reasonable probability that but for trial counsel's errors, the verdict would have been different." *Id*. "[C]ounsel is not ineffective for failing to raise meritless or futile objections." *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

Defendant contends that defense counsel's performance was deficient because he did not probe Owens further about the alleged threat. However, the record indicates the opposite. Defense counsel ended his questioning of Owens once she testified that the prosecution had threatened her to testify. The circumstances of that purported threat, however, were relatively benign, as the prosecution elicited on re-direct examination. In particular, Owens was only "threatened" by a possible forensic interview of her children without her present, or perhaps by the subpoena itself. Thus, eliciting additional information from Owens about the alleged threat simply diminished its relevance. Defense counsel can hardly be faulted for not doing so himself. His decision not to question Owens further about the alleged threat is presumed to be a reasonable, strategic decision, and defendant has the burden of proving otherwise. *Isrow*, 339 Mich App at 531-532.

Defendant has not offered any proof that there was useful information defense counsel could have elicited from Owens had he questioned her further. See *People v Haynes*, 338 Mich App 392, 430; 980 NW2d 66 (2021) (holding that the defendant has the burden of proof to establish that the testimony defense counsel allegedly failed to elicit would have benefited the defendant); *People v Pratt*, 254 Mich App 425, 430; 656 NW2d 866 (2002) (holding that there was no error apparent on the record because the defendant failed to show that the testimony his attorney allegedly failed to elicit was beneficial to him). Since defendant has not made an offer of proof showing that there was more information about the alleged threat that defense counsel could have

elicited from Owens to benefit the defense, defendant has failed to show that defense counsel performed deficiently.

Defendant also contends that defense counsel should have placed an objection on the record pertaining to the intimidation Owens allegedly sustained from the prosecution. As discussed above, however, it does not appear that the prosecution improperly intimidated or threatened Owens or caused her to alter her testimony. Since no error is apparent on the record, defense counsel was not deficient for failing to object on the basis of the alleged intimidation. See *Putman*, 309 Mich App at 245 ("[C]ounsel is not ineffective for failing to raise meritless or futile objections."). Accordingly, defendant has failed to show that defense counsel's performance was deficient in this regard as well.

But even if defense counsel's performance was deficient, defendant was not prejudiced because, as discussed above, it does not appear the prosecution's discussion of Owens's children changed whether she was going to testify, or the content of her testimony. The prosecution's reference to interviewing Owens's children did not include a threat for Owens to testify in a certain manner, or a threat that Owens needed to change or fabricate her testimony. Therefore, even if defense counsel's performance was deficient, it does not appear that defendant was prejudiced thereby. Thus, defendant has not shown that there is a reasonable probability that, but for defense counsel's alleged errors, the verdict would have been different. Accordingly, defendant has failed to show he was denied his constitutional right to the effective assistance of counsel.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence for the jury to convict him of voluntary manslaughter because he acted in self-defense. We disagree.

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (cleaned up).

"In a criminal proceeding, the defendant has a constitutional right to have the prosecution prove his or her guilt beyond a reasonable doubt . . . ." *People v Likine*, 492 Mich 367, 407; 823 NW2d 50 (2012). Defendant was charged with second-degree murder, but convicted of voluntary manslaughter. "A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that marks the crime of murder." *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003) (quotation marks and citation omitted). "To prove that a defendant committed voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013) (quotation marks and citations omitted). "However, provocation is not an

element of voluntary manslaughter; rather, it is a circumstance that negates the presence of malice." *Id.*

Defendant contends that there was insufficient evidence to convict him of voluntary manslaughter because he was acting in self-defense. "At common law, the affirmative defense of self-defense justifies otherwise punishable criminal conduct, usually the killing of another person, if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (quotation marks and citation omitted). "In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). "With the enactment of the Self–Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. "Specifically, the SDA modified the common law's duty to retreat that was imposed on individuals who were attacked outside their own home or were not subjected to a sudden, fierce, and violent attack." *Guajardo*, 300 Mich App at 35 (quotation marks and citation omitted). MCL 780.972(1) of the SDA provides, in relevant part:

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . .

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

"[O]nce a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution bears the burden of disproving the affirmative defense of self-defense beyond a reasonable doubt." *People v Rajput*, 505 Mich 7, 11; 949 NW2d 32 (2020) (quotation marks and citation omitted). To determine whether the jury properly found that the prosecution disproved defendant's claim of self-defense beyond a reasonable doubt, it is necessary to consider whether "the circumstances justified his actions." See *Dupree*, 486 Mich at 707 (quotation marks and citation omitted).

The circumstances leading up to the shooting were such that a rational trier of fact could find beyond a reasonable doubt that defendant was not justified in shooting the decedent. Although the decedent had a reputation for arguing, he had never physically threatened or attacked defendant. Defendant also knew that the decedent liked to "run the show" and control others, so his attempt at controlling defendant's behavior by aggressively telling him how not to speak to Owens also was typical behavior for the decedent. Indeed, the decedent once got chest-to-chest with defendant in an argument, and another time yelled so loudly at defendant that Owens came to see what was going on, and one of her children hit the decedent and told him to leave defendant alone. Defendant walked away from the first encounter to defuse the situation, and defendant remained calm and rested on the couch during the second. It seems unlikely that someone who was afraid of the decedent would casually lay on the couch while being yelled at by the decedent.

Because this type of behavior was common from the decedent and had never resulted in anyone being harmed, it would have been reasonable for the jury to find that defendant was unlikely to have been honestly and reasonably afraid for his life on the day in question.

Furthermore, before the shooting took place, there was no testimony that the decedent verbally threatened defendant or physically attacked him. Rather, it was defendant who shoved the decedent before pulling out his gun and shooting at the decedent seven times, four of which hit the decedent and caused his death. Two of the shots hit the decedent in the back, which indicates that the decedent may have been turning from defendant or falling to the ground while defendant was still shooting. In other words, there was nothing more than a heated discussion—which was normal—before defendant shoved the decedent, pulled out his gun, and started firing multiple times. The fact that defendant fired the gun seven times, and shot the decedent four times, two of which went into the decedent's back, suggests that this shooting was not the product of genuine self-defense. While it is true that the decedent was bigger than defendant and had a reputation for being aggressive, that alone is not enough to justify the use of deadly force in self-defense, especially since the decedent did not pull out his gun at any point during the argument.

Moreover, defendant's claim that he was honestly and reasonably afraid of the decedent imminently killing or greatly harming him was discredited by other circumstances surrounding the shooting. The decedent came to defendant's home to pick up some food that evening. When the decedent arrived, he talked with Owens and played with his grandchildren. When defendant came downstairs, he greeted the decedent normally, and the two began discussing sports. These were normal circumstances. The situation became tense after the decedent interpreted defendant's statements as disrespectful of himself and Owens. But as noted, this was not the first time that a situation had become tense between the decedent and defendant. Under these circumstances, a rational trier of fact could find beyond a reasonable doubt that defendant overreacted, and was not justified in shooting the decedent because there was no imminent threat of great bodily harm or death.

We also note that in contrast to the testimony about the decedent being argumentative and aggressive, some testimony presented at trial described the decedent as peaceful, adverse to confrontation, someone who would break up a fight if it began, respected in the community, big-hearted, smart, and the best father in the world. Kina Sanford, a long-time friend of the decedent, never saw the decedent assault anyone or reach for his gun unless he was at the shooting range. Nadia Morris never saw the decedent physically confront defendant, and opined that there was nothing unusual or adverse about their interactions. In light of this conflicting testimony about the decedent's character, a rational trier of fact could have found that the decedent was generally a peaceful, nonviolent person whom defendant would not have honestly and reasonably feared would kill or cause greatly bodily harm.

Finally, we emphasize our obligation to draw all reasonable inferences in the light most favorable to the prosecution, and make credibility findings in support of the jury's verdict. See *Kenny*, 332 Mich App at 402-403. Accordingly, we are obligated to conclude that the decedent was generally peaceful, and was unlikely to have given defendant a reason to believe that the decedent was going to kill or cause great bodily harm to him. Based on the record developed at trial, the evidence was sufficient to show that the prosecution disproved defendant's claim of self-defense beyond a reasonable doubt.

## IV. CONCLUSION

Defendant has not established any errors warranting relief.  We affirm.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michael J. Riordan