*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 31, 2025
2:36 PM

Plaintiff-Appellee,

v

No. 366536
Van Buren Circuit Court
LC No. 2021-023355-FC

TIAH DESHON-JUANITA SUTTON,

Defendant-Appellant.

Before: FEENEY, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

Defendant Tiah Deshon-Juanita Sutton appeals by leave granted[1] her convictions following a jury trial. The jury convicted defendant of second-degree murder, MCL 750.317, carrying a concealed weapon (CCW), MCL 750.227, and possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[2] The trial court sentenced defendant to 30 to 60 years' imprisonment for the murder conviction to be served consecutively to a two-years term of imprisonment for the felony-firearm conviction with credit for 463 days served as well as time served for the CCW conviction. We affirm.

## I. BACKGROUND

This case arises out of the July 8, 2021 shooting death of Shondel Newell. It was undisputed that defendant shot and killed Newell, but defendant claimed that she acted in self-defense.

Tommy Echols testified that he was with Newell that day, driving around in Newell's white Chevy Suburban. Echols described how he and Newell were "pretty much family"; in fact, Newell

---

[1] *People v Sutton*, unpublished order of the Court of Appeals, entered November 27, 2023 (Docket No. 366536).

[2] The jury acquitted defendant of one count of unlawful imprisonment and an additional felony-firearm count.

-1-

called Echols "Unc," which was short for "Uncle." According to Echols, they were about to drive out of a gas station driveway when a blue van pulled up and stopped next to the Suburban. Newell was driving and he backed up after a brief conversation with the occupants of the blue van. Both vehicles apparently parked in the gas station parking lot, and Newell got out of the Suburban and spoke to the occupants of the blue van. Echols did not get out of the Suburban and he could not hear the conversation between Newell and the occupants of the blue van.

When Newell returned to the Suburban, Echols asked him what had happened. Newell indicated that defendant was in the other vehicle and did not like the way Newell "talked to [defendant's] mom or something." Echols saw defendant in the passenger seat of the blue van, and Echols testified that "some young dude was driving."

Both vehicles left the gas station and, after driving around, both stopped at a park. At some point after leaving the gas station, Newell told Echols that he had threatened to beat up defendant and the driver of the blue van. At the park, Newell got out of the vehicle and walked over to speak to defendant, who had left her vehicle and walked to the other side of the park. According to Echols, Newell called defendant's name and she told Newell to come over to her. Echols could not hear the conversation that occurred on the other side of the park. Newell returned to the Suburban and began to drive away. Defendant and the person who had been driving the blue van apparently switched vehicles and got into a light-colored Cadillac Escalade. The Suburban and the Escalade stopped next to each other in the middle of the road and the driver of the Escalade got out to speak with Newell.

The other driver then got back in his vehicle and both vehicles pulled over to the side of the road. Newell got out of his vehicle again and walked over to the Escalade, which was now parked behind Newell's Suburban. Echols stayed in the Suburban. He testified that he did not have a clear view of the conversation through the back window of the Suburban because there were large speakers in the back. Echols leaned over to look out the driver's side window and saw Newell by the driver's side door of the other vehicle. Echols testified that he was approximately 10 or 20 feet away from the other vehicle and could not hear the conversation other than the isolated statement, "I never called your mom other than her name" or "I never called your mother out of her name."[3] According to Echols, Newell did not appear to be upset. Subsequently, Echols heard a gunshot. Echols further testified that Newell returned to the Suburban, stating: "She shot me in the heart, I'm dead." Newell tried to drive away. He stopped the vehicle, and Echols "jumped out of the car, tried to beat on a door trying to get some help." Echols saw the vehicle start moving forward again before it crashed near a Pizza Hut.

Echols testified that neither he nor Newell had a gun that day. Echols also did not see a gun in the Suburban that day, and he did not dispose of a gun that day.

David Taylor testified that on the day in question, he was sitting in his white or tan Cadillac Escalade near the previously mentioned park when he received a phone call from a man known as

_____

[3] Echols quoted the statement both ways, so it is not clear which one is the correct version of the statement he heard Newell make.

"Tata" or "Dikeist."[4] Subsequently, Dikeist and defendant walked up to Taylor's Escalade. Both Dikeist and defendant got into the Escalade, with defendant sitting in the front passenger seat and Dikeist sitting in the back. Taylor testified that he started to drive away but "met" Newell's vehicle. Taylor had known Newell for "a long time." Taylor stopped, got out of his vehicle, and went to talk to Newell. Taylor testified that he was trying to "calm the situation" because Newell was upset. Then Taylor got back into his vehicle. At some point, Newell got out his vehicle and was talking to defendant through the driver's side window of Taylor's vehicle. Newell was leaning on the vehicle. According to Taylor, defendant and Newell were arguing about Newell "disrespecting" defendant's mother. It appeared to Taylor that the disagreement was going to be resolved, so he decided to "lay back" because he did not feel well. Taylor stated that Newell was not "aggressive."

At some point, according to Taylor, Newell told defendant, "See Tiah, I should blow your chest out."[5] Taylor still had his "head back" and his eyes closed. Then he heard a gunshot. Taylor never saw Newell with a gun, and he did not know that defendant had a gun until the shot was fired.

Michael Knizewski, a police officer with the South Haven Police Department, testified that he went to a South Haven Pizza Hut that day in response to a 911 call regarding the victim of a shooting. When he arrived, he saw a white Chevy Suburban parked at an angle "over the sidewalk," appearing to have "had a[n] accident of some sort prior to coming to rest." Officer Knizewski approached the vehicle and found a man, whom he recognized as Newell, slumped against the driver's side door. Newell died on the scene. Officer Knizewski did not find any weapons on Newell's body, around the vehicle, or along the path the vehicle had traveled before coming to a stop.

Another South Haven police officer, Kevin Wildey, testified that he also responded to the 911 call that day. He searched both Newell's vehicle and the path the vehicle traveled between the location of the shooting and the Pizza Hut where the vehicle came to rest. He did not find any weapons along that path of travel or inside the vehicle.

Detective Ryan Myers testified about certain text message conversations that were recovered from defendant's cell phone. First, Detective Myers testified about a text message conversation between defendant and her father,[6] in which defendant stated, "I really don't think I'm a turn myself in. I'm a just be honest." Defendant sent that message on August 11, 2021. On September 1, 2021, defendant's father sent a message stating, "Okay, I went over there and they wouldn't answer the door about a week and a-half ago, about 3:30, it's something going on, I think Tae got the piece." Defendant asked, "Why do you think he got it?" Her father responded, "Because we do. Evidence." Detective Myers testified that "piece" is generally a term for referring to a gun and that the gun used in the shooting was never found.

---

[4] He was also referred to as "Dikeist Harper".

[5] Taylor testified that Newell made this statement or "something along those lines" (Tr II, 63).

[6] In these messages, defendant's father was referred to as "Tone."

Next, Detective Myers testified that on August 16, 2021, there was a text message exchange between defendant and her father, in which defendant stated, "Deleting these messages," and her father responded, "Yes." Detective Myers also testified about a text message conversation from August 17 between defendant and "somebody referred to as Brudda." In this exchange, defendant stated, "I want Tata gone" and "He a fuckin' O – P – P, OPP." Detective Myers then testified:

> *Q.* Do you know what that means?
>
> *A.* I do not. Brudda then responds, "I bee said that, straight snake." Ms. Sutton says, "I'm killing him, IDC." I would think it was 'I don't care.' Uhm, Brudda says, "you should have smoked him that day." Ms. Sutton says, "Dre STFU, how TF was I gonna smoke two Mfs and get away and he the . . ." excuse my language, ". . . he the nigga was driving."
>
> *Q.* Do you know what STFU stands for?
>
> *A.* Shut -- I believe it's 'shut the fuck up.'
>
> *Q.* And Mfs?
>
> *A.* Pardon my language, 'motherfuckers.' [Ellipses in original.]

Detective Myers clarified that "Tata" was "Dikeist Harper," who was with defendant at the time of the shooting.

Detective Myers testified about another text message conversation that occurred between defendant and Brudda on September 6, 2021. He read the conversation in to the record:

> *Q.* And if you can, please, can you read those messages in context again?
>
> *A.* Yes. I apologize, the first word is; "Bitch, all that time you've been puttin' in to tell me that you all could be helping me, G-T-F-O." And then, "TF, you all want me in jail for, I'm really on my deadhead doe cause . . ." I apologize . . . ["]nigga how is I or how was you the main one pressing the issue then when something happens your ass wanta tell me don't come to and now turn myself in." It follows up by saying, "I'll fuck around and say he made me do it if MFs better stop playing with me."
>
> *Q.* Now was there any responsive messages in that text thread?
>
> *A.* No, sir. [Ellipses in original.]

Finally, Detective Myers read into the record another text message that defendant wrote on September 6, 2021:

> "You don't see your phone and why Baby Tony saying the police came to the house but nobody saying nothing, if you all just sayin' stuff to get me to turn myself in it's not going to work. I'm confused on how you wanted this to happen oh so bad,

-4-

every day you was on it talking about he gotta get dealt with somehow and when it happens now it's all this you all puttin', now it's all this, you all putting all this effort into telling me to turn myself in like who wants to sit in jail instead of putting the effort into helping me move around but nobody gets that."

Defendant testified in her own defense. Defendant admitted that she had a gun with her on the day of the incident and that she was carrying it throughout the following events. She indicated that she and Newell had a discussion at the gas station where she first saw him that day and that they discussed how Newell had "disrespect[ed]" defendant's mother approximately one month earlier. Defendant testified that Newell was "calm" during this conversation at the gas station and that the conversation ended when Newell told defendant and Dikeist "he would beat our ass." Defendant and Dikeist left the gas station.

Defendant explained that she and Dikeist went to the park so Dikeist could return the vehicle they were driving to his mother. Defendant and Dikeist walked across the park, saw Taylor, and got into Taylor's vehicle. Defendant still had a gun with her. Newell arrived and started walking toward Taylor's vehicle while "hollering" defendant's name. Defendant denied ever telling Newell to come over to her and she denied ever having a conversation with Newell in the park while outside of Taylor's vehicle. Defendant testified that Newell was within six or seven feet of the vehicle and told her, "I got thirty on for you, you can't miss these." Defendant understood that statement to mean that he had 30 "shots" or "rounds" for her and that he would not miss. Newell then walked back to his vehicle and drove back toward Taylor's vehicle. Taylor got out and spoke to Newell, but defendant could not hear their conversation.

Defendant testified that after Taylor returned to his vehicle, Newell got out of his vehicle and walked over to the driver's side of Taylor's vehicle. Newell was leaning on Taylor's vehicle with his arms on the window opening and talking to defendant. According to defendant, Newell was continuing to tell her that he did not disrespect her mother, but defendant was "dismissing the conversation." Defendant testified that Newell became frustrated and that Newell stated, "See Tiah, I'm going to shoot you in your chest. I'm gong [sic] to put one in your chest." Defendant's trial counsel questioned defendant as follows about what happened next:

> *Q*. Now when he said that, did he do anything or move his body in any way?
>
> *A*. He dropped his arms from where he had them at up on the window.
>
> *Q*. Could you see his hands once he dropped his arms?
>
> *A*. No, sir.
>
> *Q*. So when he made that statement and he dropped his arms what did you think was about to happen?
>
> *A*. That I was going to get shot due to the threat that he just made.
>
> *Q*. Based on the threat that he had just made?

*A*. Yes.

*Q*. Did he make any other threats to you earlier in the day that made you think that he had a gun?

*A*. Yes, the one where he said he had 30 of them for me and I couldn't miss these.

*Q*. Now after he said that, had he went back to his car?

*A*. Yes.

*Q*. And then he came back around standing at the window?

*A*. Correct.

*Q*. So as soon as he said that he was going to put one in your chest, he dropped his hands down to where you couldn't see them what were you thinking was going to happen?

*A*. That I was going to get shot.

*Q*. So what did you do?

*A*. So I immediately reached for my gun and I shot.

*Q*. How many times did you shoot?

*A*. Once.

*Q*. Could you have shot more?

*A*. Yes.

*Q*. What was your purpose in shooting him?

*A*. Because I thought I was going to get shot.

Defendant testified that she did not believe in that moment that there was anything else she could do to avoid being shot. Defendant believed her life was in danger. She, Taylor, and Dikeist immediately left the area. Defendant indicated in her trial testimony that she agreed with the statement, "guilty or not, we take off." Furthermore, defendant admitted that she killed Newell. She did not call the police because she was afraid and did not want to go to jail. Defendant buried the gun shortly after the incident because it was "just an instinct." She had heard that Newell was a violent person. She never saw Newell with a gun or weapon that day. However, defendant testified that Newell was following her and becoming more aggressive throughout the day. She denied putting the gun on Taylor's arm and telling him to drive away, and she denied telling Taylor where to go after they left.

Defendant was convicted and sentenced as previously stated. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE REGARDING SELF-DEFENSE

Defendant first argues that the evidence was insufficient for the jury to conclude beyond a reasonable doubt that she did not act in self-defense.[7] We disagree.

"Due process requires that the evidence show guilt beyond a reasonable doubt in order to sustain a conviction." *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). When addressing a claim that the prosecution did not present sufficient evidence to sustain a conviction, an appellate court "must consider not whether there was any evidence to support the conviction but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992) (quotation marks and citation omitted). "The sufficient evidence requirement is a part of every criminal defendant's due process rights," and it "is an attempt to give 'concrete substance' to those rights, by precluding irrational jury verdicts." *Id*. at 514 (citation omitted). An appellate court reviewing a sufficiency claim "must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Id*. at 515.

Moreover, "[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted; alteration in original). "It is the jury's task to weigh the evidence and decide which testimony to believe." *Unger*, 278 Mich App at 222 (quotation marks and citation omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Id*. "The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Oros*, 502 Mich at 239 (quotation marks and citation omitted).

"Once a defendant raises the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution must exclude the possibility of self-defense beyond a reasonable doubt." *People v Ogilvie*, 341 Mich App 28, 36; 989 NW2d 250 (2022). "Under the common law, the affirmative defense of self-defense justified the killing of another person if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013)

---

[7] It appears that defendant's appellate argument is directed at the murder conviction, but she does not clearly specify whether she is attacking any other convictions on this ground. Because defendant has not shown that the evidence was insufficient to support a conclusion beyond a reasonable doubt that defendant did not act in self-defense, which is the only argument defendant makes regarding the sufficiency of the evidence, defendant has not demonstrated that any of her convictions should be reversed on this basis.

(quotation marks and citation omitted). "The reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *Id*. at 42 (quotation marks and citation omitted).

Here, there was testimony that Newell made statements to defendant that she understood constituted threats that he would shoot her. After the last of these statements, which Newell made while talking to defendant through the driver's side window of Taylor's vehicle, Newell moved his hands below the edge of the window, and defendant immediately shot him because she assumed that he was moving to grab a gun. But Newell was actually unarmed and there was no evidence that he ever had a gun or other weapon that day. "[T]hreats of future harm do not constitute imminent danger for purposes of self-defense" and thus do not justify the use of deadly force. *Guajardo*, 300 Mich App at 42. Viewing the evidence in the light most favorable to the prosecution, the jury could have rationally found beyond a reasonable doubt that defendant's belief that there was an imminent danger to her life or threat of bodily harm was not reasonable and that her use of deadly force was therefore not justifiable self-defense. *Id*. at 35, 42. To the extent that defendant argues on appeal that the evidence better supported a contrary conclusion, she essentially asks this Court to engage in a reweighing of the evidence and redetermination of credibility assessments, contrary to the proper standard of review. *Unger*, 278 Mich App at 222.

Thus, defendant has failed to show that her convictions were not supported by sufficient evidence.

## III. MISTRIAL

Next, defendant argues that the trial court abused its discretion by denying defendant's motion for a mistrial after Echols testified that defendant was known to carry guns and shoot at people.

The "proper standard of review for a trial court's decision to grant or deny a mistrial is abuse of discretion." *People v Ortiz-Kehoe*, 237 Mich App 508, 513; 603 NW2d 802 (1999). "An abuse of discretion occurs when the result is outside the range of principled outcomes." *People v Flores*, 346 Mich App 602, 608; 13 NW3d 668 (2023).

Near the end of defendant's trial counsel's recross-examination of Echols, defendant's trial counsel questioned Echols about the time between leaving the gas station where they first encountered defendant in the blue van and finding defendant at the park. The following exchange occurred:

> *Q*. Did it seem to you as though [Newell] was looking for [defendant] based on the way he was acting and what he said?
>
> *A*. No.
>
> *Q*. No? So asking where [defendant] is doesn't seem like he's looking for [defendant]?
>
> *A*. I thought that he might have been scared.

-8-

*Q.* Sorry.

*A.* Thought me might have been scared of her.

*Q.* Okay.

*A.* So she had been known to carry guns. They had been known to shoot at other people.

The jury was dismissed, and defendant's trial counsel moved for a mistrial. The trial court denied the motion for a mistrial and provided a curative instruction to the jury as soon as the jury was brought back into the courtroom. The trial court's instruction to the jury was as follows:

Welcome back, jury. And jury I am striking the last, uh, answer of this witness. That is stricken from the record, you may not consider that if you heard it. You may not consider the witness's answer in any way. It's not evidence in this case and must not influence your verdict at all. Okay.

Defendant argues on appeal that the trial court should have granted her motion for a mistrial because the statement by Echols was highly prejudicial and impaired her right to a fair trial. "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Ortiz-Kehoe*, 237 Mich App at 513-514; accord *Flores*, 346 Mich App at 608.

Here, the statement was spontaneously volunteered by Echols and was not even a response to a pending question. "[A]n unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). Moreover, the trial court gave a contemporaneous curative instruction once the jury was brought back into the courtroom following the discussion and ruling on defendant's motion for a mistrial. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Mesik (On Reconsideration)*, 285 Mich App 535, 542; 775 NW2d 857 (2009) (quotation marks and citation omitted). Defendant has not shown that the trial court abused its discretion by denying her motion for a mistrial.

## IV. DRUG PROFILE EVIDENCE

Defendant next raises several claims of evidentiary error related to alleged drug profile evidence along with related claims of ineffective assistance of counsel.

A party preserves a claim that evidence was improperly excluded by informing the court of the substance of the evidence through an offer of proof, unless the substance was apparent from the context within which the questions were asked. MRE 103(a).[8] Here, defendant's trial counsel

---

[8] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This general principle of preservation is substantively the same in both the prior and revised versions of MRE 103.

provided an offer of proof as to the nature of the evidence he believed he would elicit from the officer and the trial court excluded the evidence. With respect to defense counsel's questioning of defendant, the substance was apparent from the question to which the prosecution objected. Consequently, defendant's evidentiary issues are preserved. *Id*.

This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Mesik*, 285 Mich App at 537. "The trial court abuses its discretion when its decision is outside the range of principled outcomes." *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). But, this Court "review[s] de novo the trial court's rulings on preliminary questions of law regarding the admissibility of evidence, such as the application of a statute or rule of evidence." *Id*. The question whether "a defendant's right to present a defense was violated by the exclusion of evidence is a constitutional question that this Court reviews de novo." *Mesik*, 285 Mich App at 537-538.

An ineffective assistance of counsel claim is preserved by moving in the trial court for a new trial or an evidentiary hearing. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Here, this Court denied defendant's motion to remand.[9] Thus, although defendant took steps to preserve this issue, there has not been an evidentiary hearing. When there has not been an evidentiary hearing "this Court's review is limited to mistakes apparent from the record." *Id*.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "This Court reviews findings of fact for clear error and questions of law de novo." *Heft*, 299 Mich App at 80.

Defendant first argues that the trial court erred when it sustained the prosecution's objection to defense counsel's questions regarding a scale and purported drugs found in Newell's vehicle, which defendant maintains would have shown that Newell was a drug dealer who would likely have carried a gun. Defendant maintains that this inference would have supported defendant's self-defense claim because it would have shown that she was justified in believing that Newell had a gun and was going to shoot her. The issue arose as follows during defense counsel's cross-examination of Officer Wildey:

> *Q*. Prosecutor kept asking if you found any weapons in the vehicle but what did you find in that vehicle?
>
> [*Prosecutor*]: Objection, relevance. May we approach please, your Honor. [Tr I, 199.]

---

Moreover, the trial in this case occurred before the amendments took effect and all references to the Michigan Rules of Evidence will be to the former version that was in effect at the time of trial unless otherwise noted.

[9] *People v Sutton*, unpublished order of the Court of Appeals, entered May 23, 2024 (Docket No. 366536).

The jury was excused from the courtroom, and the trial court asked defense counsel what evidence he was trying to elicit from the officer. Defense counsel responded that he planned to ask Officer Wildey

> what he found in the vehicle and I expected those answers to be both crack cocaine and a digital scale. Why I believe that's relevant is for two reasons; the self-defense instruction is going to have to do with how [defendant] perceived things at the time that she acted in justifiable self-defense. Police officers testify all the time based on their training and experience to things that certain people are known to carry. I believe it's incredibly relevant and I don't want to put words in the officer's mouth but I believe that he would [sic] people that commonly have crack cocaine and digital scales are in the business of selling drugs. Commonly, people who are in the business of selling drugs are in possession of guns. If that somebody who is known to carry these things around then I believe then it would be known to [defendant] that it more likely that he would have a firearm.
>
> Secondly—

The trial court interrupted and the following discussion ensued:

> [*The Court*]: When, when -- stop. How are you -- you're doing a lot, I believe, if, I believe, if, I believe, if. Uhm, did [defendant] know that he -- are you saying that this person was a drug dealer and [defendant] knew that and [defendant] knew he had a gun or believed he had a gun because he's a drug dealer and so she acted with that perception? It's all about Ms. Sutton's perception at the time.
>
> [*Defense Counsel*]: Right, right. And what I'm saying is, what I'm saying is, that yes, based on the activity that he was engaged in it was –
>
> [*The Court*]: Did she know it? At the time –
>
> [*Defense Counsel*]: I'm sorry?
>
> [*The Court*]: Did she know that at the time? Is she going to testify, are you going to present testimony that she knew that he was engaged in the activity at the time?
>
> [*Defense Counsel*]: I don't know if she's going to testify to that exactly or not. We could leave Officer Wildey under subpoena if she does to come back and testify.
>
> * * *
>
> [*The Court*]: What evidence do you have that Mr. Newell was in the business of selling drugs?
>
> [*Defense Counsel*]: Two questions I was going to ask Officer Wildey about having crack cocaine and digital scale.

-11-

The prosecutor argued against allowing defense counsel to elicit this testimony. The trial court ruled:

> Okay. I'm going to deny the request at this time. You may be able to lay a foundation through out [sic] the remainder of the case but at this time, I haven't heard any foundation to tie this speculation into some proper defense that's admissible without carrying [defendant]'s perception of things.

> * * *

> All I'm ruling, . . . my ruling is that you cannot inquire about the cocaine in that car at this time. You have not laid any foundation for it's [sic] relevance either for the Prosecution's case or for a self-defense case.

The trial court clarified that the ruling extended to the digital scale also, concluding:

> [*The Court*]: Well, you should know what he's going to say, what's in his report?

> [*Defense Counsel*]: Cocaine and digital scale.

> [*The Court*]: Okay. I've ruled on that, the answer is I'm not going to allow that to come out at this time. You've laid no foundation for its relevance. Okay.

> [*Defense Counsel*]: Okay. I understand, your Honor.

> [*The Court*]: Okay. You can keep him under subpoena and we can re-visit it later if you can tie it all together but right now it seems like a lot of speculation and character assassination on, uhm, when we don't even have this self-defense foundation laid at all.

Finally, the prosecutor indicated that he was uncertain whether the substance found in the vehicle actually was crack cocaine because it was never tested by a laboratory.

At the time of trial, MRE 401 defined "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Evidence which is not relevant is not admissible." MRE 402. Defendant's trial counsel argued that the evidence allegedly showing Newell's involvement with drug dealing was relevant because it would support an inference that Newell was more likely to have possessed a gun, which in turn would support her claim that she feared getting shot and acted in justifiable self-defense. Even accepting defense counsel's line of reasoning as correct, such evidence would only be relevant if defendant had knowledge that Newell was involved in dealing drugs because if defendant were unaware of Newell's alleged drug dealing activity, that activity could not possibly serve as a basis for her to believe he had a gun. The trial court properly recognized this issue of conditional relevance. See MRE 104(b) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."). Defendant testified at trial, but she did not claim to

be aware that Newell was involved in dealing drugs. On appeal, defendant does not cite any record evidence that defendant possessed such knowledge about Newell. Therefore, defendant has not demonstrated that the trial court's ruling was an abuse of discretion. *King*, 297 Mich App at 472.

Defendant also asserts that the trial court erred by sustaining the prosecutor's objection when defense counsel asked defendant during her testimony, "Now somebody makes a threat regarding a weapon and they walk back to that car what does that make you think?" The trial court ruled that the question called for speculation. On appeal, defendant does not develop any cogent argument or cite any legal authority demonstrating what the answer to this question would have been and how it was admissible. Defendant merely states, without further elaboration, "This ruling was in error as this question was merely an attempt to delve into the state of mind of Ms. Sutton and to support her defense of self-defense." "An appellant may not merely announce [her] position and leave it to this Court to discover and rationalize the basis for [her] claims, nor may [she] give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Thus, this argument is abandoned.

Defendant additionally argues that the trial court's rulings excluding drug profile evidence denied her constitutional right to present a defense of self-defense. As an initial matter, we note that defendant did present her claim of self-defense, testifying that she shot Newell because she believed Newell was going to shoot her. Moreover, although a criminal defendant has a constitutionally protected right to present a complete defense, that right "is not unlimited and is subject to reasonable restrictions." *King*, 297 Mich App at 473. This Court has held that the "Michigan Rules of Evidence do not infringe on a defendant's constitutional right to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. at 474 (quotation marks and citation omitted). Here, defendant has merely argued that the trial court erred by excluding certain evidence but has not developed any argument that any particular rule under which the evidence was excluded was arbitrary or disproportionate to its intended purpose. Absent such a showing, defendant cannot demonstrate that her constitutional right to present a defense was infringed. *Id*.

Next, defendant also contends that her trial counsel was ineffective for failing to move for an expert in drug profile evidence and failing to recall Officer Wildey to testify about whether drug dealers usually carry weapons. But, as previously explained, this evidence was not admissible because the proper foundation had not been laid and it was therefore not relevant. Accordingly, defendant has not shown that she received ineffective assistance of counsel because "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## V. PROSECUTORIAL MISCONDUCT

Next, defendant argues that the prosecutor committed misconduct by improperly vouching for the credibility of prosecution witnesses and mischaracterizing the testimony. We disagree.

"Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *Unger*, 278 Mich App at 234-235 (quotation

marks and citation omitted). Here, defendant did not object to the challenged prosecutorial comments or request curative instructions, and this issue is unpreserved. *Id.*

This Court's review of unpreserved issues of alleged prosecutorial misconduct is for plain error. *Id.* at 235. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If the defendant satisfies these three requirements, then the appellate court "must exercise its discretion in deciding whether to reverse." *Id.* Reversal is only warranted if the plain error either "resulted in the conviction of an actually innocent defendant" or "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 763-764 (quotation marks and citation omitted; alteration in original). In the context of a prosecutorial misconduct claim, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect" because "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (quotation marks and citations omitted).

Defendant argues that the prosecutor committed misconduct during closing argument by stating that defendant "lied about Mr. Newell following her to the park, . . . [and] about having a conversation with Mr. Newell while she was in the car . . . ." Defendant argues that the prosecutor committed further misconduct by stating during rebuttal argument that defendant was not telling the truth and was trying to make Newell seem worse than he actually was.

The "test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64.

Prosecutors should not "express their personal opinion of a defendant's guilt," and also "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995). In this case, however, the prosecutor's statements constituted expressions that defendant's testimony was not credible or worthy of belief because of internal inconsistencies in defendant's story, instances where she changed her story, and contradictions with the events as described by a majority of other witnesses. A prosecutor is "free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66. Furthermore, a prosecutor may argue from the evidence that a "witness is not worthy of belief." *Unger*, 278 Mich App at 240. Arguments regarding whether a witness is credible or worthy of belief, which are based on the facts and testimony, do not constitute improper vouching. *Dobek*, 274 Mich App at 66. Here, the prosecutor's comments challenged on appeal were not improper. *Id.*; *Dobek*, 274 Mich App at 66. Regardless, any improper prejudicial effect could have been cured by a proper instruction so reversal is not warranted. *Unger*, 278 Mich App at 235.

Defendant also argues that the prosecutor committed misconduct by stating during his closing rebuttal argument that defendant was not telling the truth and was trying to make Newell seem worse than he was. For the same reasons just discussed, these statements also did not constitute prosecutorial misconduct. *Dobek*, 274 Mich App at 66; *Unger*, 278 Mich App at 240.

-14-

Furthermore, during closing argument, defendant's trial counsel argued that "Shondel was following [defendant] and harassing her that whole day." Defendant's trial counsel also argued that defendant did not shoot Newell until "her life was threatened" because her intent was self-protection, that defendant was "honest" and "truthful" during her testimony, and that Echols did not want to paint Newell in a bad light because Echols and Newell were friends. Thus, the prosecutor's rebuttal statements are also responsive to the arguments advanced by defendant's trial counsel in closing argument. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial." *Dobek*, 274 Mich App at 64. Even "[o]therwise improper prosecutorial conduct or remarks might not require reversal if they address issues raised by defense counsel." *Id*. For these reasons, defendant has not established prosecutorial misconduct on this ground either. Moreover, any potentially improper prejudicial effect could have been cured by a proper instruction and reversal is not required. *Unger*, 278 Mich App at 235.

Finally, [f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *Ericksen*, 288 Mich App at 201. And, because defendant has not established that any improper statements constituting prosecutorial misconduct occurred, she has also failed to demonstrate that trial counsel was ineffective for failing to object to them. *Id*.

## VI.  RACIAL COMPOSITION OF JURY POOL

Next, defendant argues that she was denied her Sixth Amendment right to a jury pool representative of a fair cross-section of the community because there was only one person of color in the 90-person juror pool.

To preserve a fair-cross-section challenge for appeal, the defendant "must raise this issue before the jury is empaneled and sworn." *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003). Here, defendant does not claim to have raised this issue before the jury was empaneled and sworn, and our review of the record has not revealed any such objection. Therefore, this issue is unpreserved. *Id*.

Unpreserved fair-cross-section claims are reviewed for plain error affecting substantial rights. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 428; 884 NW2d 297 (2015). On plain-error review, a defendant must demonstrate (1) error, (2) that was plain, and (3) that it affected his substantial rights. *Carines*, 460 Mich at 763.

As our Supreme Court has stated, "the Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the community." *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). In *Bryant*, our Supreme Court explained:

> A fair-cross-section claim under the Sixth Amendment requires a defendant to make a prima facie case as set forth by the United States Supreme Court in *Duren v Missouri*[, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979).] Namely, a defendant must show:

> (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Bryant*, 491 Mich at 581-582, quoting *Duren*, 439 US at 364.]

Here, although there "is no dispute that African–Americans . . . are a distinct group in the community for the purposes of determining whether there is a violation of the Sixth Amendment's fair-cross-section requirement," *Bryant*, 491 Mich at 598, defendant has failed to provide any evidence to support the other two requirements of a prima facie case under the *Bryant*/*Duren* framework. Even accepting defendant's assertion that only one out of the 90 jury pool members was a "person of color,"[10] defendant has not provided any evidence regarding the racial composition of jury pools in Van Buren County over time. Our Supreme Court held in *Bryant* that when considering the second prong of the test, concerning whether representation of the allegedly excluded distinctive group is fair and reasonable, courts "must examine the composition of jury pools and venires *over time* using the most reliable data." *Id.* at 599-600. Moreover, contrary to defendant's argument, courts must "evaluate the composition of venires over a *significant* time period rather than *just* the defendant's individual venire." *Id.* at 600 (emphasis added).

Therefore, defendant has failed to demonstrate that she is entitled to appellate relief on this ground. *Id.* at 581-582. To the extent defendant requests an evidentiary hearing to develop the necessary record that is currently lacking, defendant has not provided this Court with the necessary affidavit or offer of proof regarding what would be established at that hearing and thus has not shown that this requested relief is warranted.[11] MCR 7.211(C)(1) (stating that a motion in the Court of Appeals to remand for development of a factual record for appellate review "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing"). Further, in light of this lack of evidentiary support, defendant also has not shown that an objection to the racial composition of the jury panel would have had any merit. Therefore, she has not shown that her trial counsel was ineffective on this ground. *Ericksen*, 288 Mich App at 201.

## VII.  TEXT MESSAGE EVIDENCE

Defendant next argues that the trial court abused its discretion by admitting text messages from defendant's phone into evidence.

---

[10] There does not appear to be any evidence in the record to support this assertion. Defendant does not cite any portion of the record to support it and we have not located any such evidence in the record.

[11] Although defendant filed an affidavit, she merely averred that she "believes that had her attorney challenged the jury venire, recalled a key witness, hired an expert in drug profile evidence and objected to the prosecutor's closing arguments, and otherwise given effective assistance, she would have received a fair trial and she would have been acquitted."

-16-

Under MRE 103(a)(1), a challenge to the admission of evidence is preserved by making a "timely objection" and "stating the specific ground of objection." Here, defendant's trial counsel objected to the admission of the text messages on the grounds of relevance and improper character evidence. The trial court overruled these objections. Thus, defendant's appellate argument based on the relevance of this evidence is preserved. MRE 103(a)(1). But, defendant's appellate argument that the text messages should have been excluded under MRE 403 is unpreserved because that ground for exclusion was not raised in the trial court. "An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993).

Preserved claims of error based on a trial court's evidentiary rulings are reviewed for an abuse of discretion. *Mesik*, 285 Mich App at 537. "The trial court abuses its discretion when its decision is outside the range of principled outcomes." *King*, 297 Mich App at 472. But, this Court "review[s] de novo the trial court's rulings on preliminary questions of law regarding the admissibility of evidence, such as the application of a statute or rule of evidence." *Id.* Unpreserved claims of error are reviewed for plain error affecting substantial rights, which requires the defendant to show that (1) there was an error, (2) that was plain, and (3) that affected the outcome of the proceedings. *Carines*, 460 Mich at 763.

As evident from our quotations of the text messages in the background section of this opinion, the text messages generally contain statements by defendant to the effect that she would not turn herself in, was deleting messages, wanted to kill one of the individuals who was with her the day of the shooting, wanted more help evading law enforcement, and had "dealt" with someone as desired by the recipient of defendant's text message. The messages also contain an apparent reference to the whereabouts of a gun that was "evidence."

At trial, before the text messages were admitted into evidence and presented to the jury, defendant's trial counsel objected to admitting the text messages on the grounds of relevance and improper character evidence. An extended discussion was held outside the jury's presence. The prosecutor argued that the text messages were directly relevant to refuting defendant's claim of self-defense, showing defendant's intent regarding the shooting, and showing attempts to conceal the crime. The trial court overruled defendant's objections and admitted the evidence. The trial court ruled that the text messages were not character evidence and were relevant to defendant's intent and the question of whether defendant acted in self-defense.

On appeal, defendant first argues that the text messages were inadmissible because they were not relevant. At the time of trial, MRE 402 provided that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court," and "[e]vidence which is not relevant is not admissible." Under the version of MRE 401 in effect at the time of trial, "[r]elevant evidence" was defined to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evidence is thus relevant if it both "is material and has probative value." *People v Rajput*, 505 Mich 7, 13; 949 NW2d 32 (2020), as amended on recon 505 Mich 1112 (2020). "Materiality is the requirement that the proffered evidence be related to any fact that is of consequence to the

action." *Id*. (quotation marks and citation omitted). "[E]vidence has probative value when it tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id*. (quotation marks and citation omitted). Moreover, the "threshold is minimal: *any* tendency is sufficient probative force." *Id*. (quotation marks and citation omitted; emphasis added).

Here, defendant admitted that she shot and killed Newell, but she claimed that she acted in self-defense. Her self-defense claim was thus the central factual dispute at trial. As previously discussed, the prosecution has the burden to disprove a defendant's self-defense theory once the defendant produces sufficient evidence to establish a prima facie case. *Ogilvie*, 341 Mich App at 36. For a killing to be justified by self-defense, the defendant must have honestly and reasonably believed that her life was in imminent danger or that there was a threat of serious bodily harm necessitating the use of deadly force. *Guajardo*, 300 Mich App at 35. "The reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *Id*. at 42 (quotation marks and citation omitted). Accordingly, a defendant's state of mind is at issue when the prosecution attempts to rebut a defendant's claim of self-defense by showing that the defendant did not honestly and reasonably believe "that his or her use of force was necessary to defend himself or herself . . . ." *People v Denson*, 500 Mich 385, 399; 902 NW2d 306 (2017).

The text messages introduced into evidence provided insight into defendant's state of mind about the killing. Defendant's discussions touch on the incident while showing her concern about avoiding the authorities, her desire to kill an individual who was present during the shooting, the location of the gun allegedly used in the shooting, and an apparent pre-existing desire to "deal" with Newell that was held by persons of defendant's acquaintance. In the midst of these discussions, defendant gave no indication that she acted in self-defense prompted by a fear of serious imminent bodily harm. Defendant's state of mind, and whether she honestly and reasonably believed that her life was in danger or that there was an imminent threat of serious bodily harm such that deadly force was necessary, were facts of consequence to the action, and thus, material because the prosecution was required to prove that defendant did not act out of such belief. *Rajput*, 505 Mich at 13. The content of the text messages indicates more of a concern with avoiding accountability for a criminal act than expressions of having acted out of fear of imminent harm, making it at least minimally more probable that defendant did not act out of self-defense and rendering this evidence probative. *Id*. The trial court did not abuse its discretion by admitting this evidence and overruling defendant's objection based on relevance.

Defendant next argues that even if relevant, the text messages should have been excluded under MRE 403. At the time of trial, MRE 403 provided that evidence, even if relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Defendant seems to argue that the texts contained unfairly prejudicial information because the jury could have inferred that she "knows and associates herself with the criminal element" or that she may have killed Dikeist because he did not testify at trial. These fears appear to be entirely speculative. Defendant further complains that the prosecutor relied on the text messages to argue that she committed premeditated murder, that she was attempting to run from the police, and that the text messages essentially amounted to

a confession. But, defendant's arguments merely demonstrate that the text messages were damaging to her defense, not *unfairly* prejudicial. As our Supreme Court has explained:

> All evidence offered by the parties is "prejudicial" to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded.
>
> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403 . . . . Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect . . . . It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

Similarly, the Michigan Court of Appeals stated:

> "Unfair prejudice" does not mean "damaging." Any relevant testimony will be damaging to some extent. We believe that the notion of "unfair prejudice" encompasses two concepts. First, the idea of prejudice denotes a situation in which there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury. In other words, where a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, a situation arises in which the danger of "prejudice" exists. Second, the idea of unfairness embodies the further proposition that it would be inequitable to allow the proponent of the evidence to use it. Where a substantial danger of prejudice exists from the admission of particular evidence, unfairness will usually, but not invariably, exist. Unfairness might not exist where, for instance, the critical evidence supporting a party's position on a key issue raises the danger of prejudice within the meaning of MRE 403 as we have defined this term but the proponent of this evidence has no less prejudicial means by which the substance of this evidence can be admitted. [*People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod 450 Mich 1212; 539 NW2d 504 (1995) (citations omitted; ellipses in original).]

Accordingly, defendant has not demonstrated that it was erroneous for the text messages not to be excluded under MRE 403; although it was damaging to the defense, it did not introduce "extraneous considerations" into the case. *People v Mayhew*, 236 Mich App 112, 122; 600 NW2d 370 (1999). In turn, having failed to show any error in the admission of this evidence, defendant has also not established that her trial counsel was ineffective for not making a meritless objection. *Ericksen*, 288 Mich App at 201.

## VIII. CUMULATIVE ERROR

Defendant additionally argues that the cumulative effect of these numerous errors also entitles her to a new trial. But, because defendant did not demonstrate the existence of any of her alleged claims of error, a cumulative effect of errors cannot be found. *Mayhew*, 236 Mich App at 128.

## IX. SENTENCING ISSUES

Defendant next argues that she is entitled to resentencing because her guidelines were incorrectly scored and her sentence was disproportionate. We disagree.

## A. OV 6

With respect to defendant's sentencing guidelines challenge, this Court reviews the trial court's factual determinations for clear error, noting that they must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

Defendant contends that OV 6 should have been scored at 10 points instead of 25 points because the killing occurred in a "combative situation" or in response to the decedent's "victimization" of defendant. OV 6 is contained in MCL 777.36, which provides:

> (1) Offense variable 6 is the offender's intent to kill or injure another individual. Score offense variable 6 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

> (a) The offender had premeditated intent to kill or the killing was committed while committing or attempting to commit arson, criminal sexual conduct in the first or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping or the killing was the murder of a peace officer or a corrections officer ………………………. 50 points

> (b) The offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result ……………………… 25 points

> (c) The offender had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm or there was gross negligence amounting to an unreasonable disregard for life …………………………. 10 points

> (d) The offender had no intent to kill or injure …………………… 0 points

(2) All of the following apply to scoring offense variable 6.

      (a) The sentencing judge shall score this variable consistent with a jury verdict unless the judge has information that was not presented to the jury.

      (b) Score 10 points if a killing is intentional within the definition of second degree murder or voluntary manslaughter, but the death occurred in a combative situation or in response to victimization of the offender by the decedent.

Defendant's 25-point score for OV 6 is consistent with the jury's verdict convicting her of second-degree murder. See MCL 777.36(2)(a); see also *People v Aldrich*, 246 Mich App 101, 123; 631 NW2d 67 (2001) (stating that the requisite malice for purposes of establishing second-degree murder "is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm") (quotation marks and citations omitted); *People v Walker*, 330 Mich App 378, 383; 948 NW2d 122 (2019) ("First-degree premeditated murder is only distinguished from second-degree murder by the element of premeditation," and "premeditation may be established by circumstantial evidence tending to show that a defendant had an opportunity to think about, evaluate, or take a 'second look' at their actions.").

Furthermore, although MCL 777.36(2)(b) provides that 10 points should be scored "if a killing is intentional within the definition of second-degree murder or voluntary manslaughter, but the death occurred in a combative situation or in response to victimization of the offender by the decedent," the evidence at trial established that *at most*, there was some sort of verbal threat by the decedent directed toward defendant.

In *People v Rodriguez*, 212 Mich App 351, 353; 538 NW2d 42 (1995), this Court addressed the meaning of a "combative situation" for purposes of an OV within a predecessor version of sentencing guidelines that used language virtually identical the language now contained in MCL 777.36(2)(b). In that case, the decedent had intervened in a physical fight to defend himself and others from a group that included the defendant who had instigated the physical altercation. *Rodriguez*, 212 Mich App at 353-354. The decedent attempted to use a wooden crutch as a weapon, but somebody took the crutch from him and hit him with it. *Id*. at 354. The defendant stabbed the decedent four times while the decedent was on the ground in a helpless position, killing the decedent. *Id*. The *Rodriguez* Court held that these circumstances did not meet the threshold of a combative situation warranting the lower 10-point score because the decedent was not the initial aggressor, the decedent was helpless when he was stabbed, and defendant and his associates created the altercation. *Id*. at 354-355.

Here, where the decedent was unarmed and made only verbal threats—which are insufficient to support a theory that defendant acted in self-defense, as explained above—the circumstances also do not rise to the level of a combative situation or victimization of defendant. *Id*. Defendant has not established her claim of scoring error.

## B. PROPORTIONALITY

Lastly, defendant argues that her within-guidelines sentence was unreasonable. Defendant's minimum guidelines range was 270 to 450 months, and defendant was sentenced to 30 to 60 years' imprisonment for her murder conviction.

"[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). "Under the guidelines, offense and prior record variables are scored to determine the appropriate sentence range. Offense variables take into account the severity of the criminal offense, while prior record variables take into account the offender's criminal history." *People v Babcock*, 469 Mich 247, 263-264; 666 NW2d 231 (2003). A sentencing court abuses its discretion if the sentence imposed is disproportionate to the seriousness of the circumstances involving the offense and the offender. *Steanhouse*, 500 Mich at 460.

"With regard to a within-guidelines sentence, there is a nonbinding presumption of proportionality." *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 5 (quotation marks and citation omitted). "[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Id.* (quotation marks and citation omitted). "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). "[T]he Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system." *Milbourn*, 435 Mich at 668. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003).

In this case, scoring of the legislative sentencing guidelines resulted in a minimum recommendation of 270 to 450 months' imprisonment. The probation department recommended a 30 to 60-year term of imprisonment for defendant's second-degree murder conviction. Thus, the 360-month minimum sentence fell exactly in the middle of the guidelines' recommendation.

At sentencing, the victim's mother, the victim's sister, and the mother of the victim's youngest son provided victim-impact statements. The victim's mother described her deep grief. The victim's sister reported that, before defendant killed the victim, defendant had shot at a good friend of their family. Both the mother and the sister were distraught over the manner in which the defense attempted to portray the victim during trial. And the mother of the murder victim's youngest child reported that the child was "suffering" after losing his "best friend" and male role model.

Thereafter, defense counsel said that he and defendant understood the victim's family's position, but counsel noted that the jury had acquitted defendant of first-degree murder. Moreover,

counsel stated that defendant regretted her actions and understood that "she's going to be doing a substantial amount of prison time[.]" Defense counsel asked the court to consider imposing a sentence at the bottom of the sentencing guidelines recommendation. Defendant opted not to allocute.

The prosecutor then advocated for the sentence recommended by the probation department. He stated:

> [T]he Court had the opportunity to sit in review of this case, and hear the, see the jury's verdicts.
>
> [Defendant] tried to claim self-defense. Obviously[,] the jury didn't buy it. The jury speaks through its verdict and they found her guilty of [s]econd[-][d]egree [m]urder. Not [m]anslaughter, not any lesser offense and they believed that she had the intent to kill Shondel Newell that day, which she did.
>
> What struck me the most about this case in reviewing everything and I hope it struck the Court as well, was there was a complete lack of value in human life. There was a complete disregard for human life in this case. If the Court remembers the text messages that were entered as exhibits in this case. [Defendant] had absolutely no value for human life. This wasn't some remorseful act. I have yet to see any sign of remorse in any way, shape or fashion. All I've seen is anger, and the intent to kill which is what the jury found.
>
> And with all of that, your Honor, the recommendation from the Department of Corrections for 30 to 60 years in prison is entirely appropriate. [Defendant] is approximately 25 years old, that would only make her eligible for parole at the age of 55. At a point in time in her life where she should be number one, aged out of the criminal justice system, but also, at an age where she[] no longer poses a risk to the public. She is a person that was carrying a weapon. She was carrying that weapon with the intent to use it against another person as is clear from the jury's verdict. So based on all of that, your Honor, I think the [probation department's] recommendation is appropriate. I'd ask the Court to follow it[.]

The trial court then sentenced defendant. It stated:

> [Defendant], I had hopes for you. I put you on probation on another case, you had violation after violation, after violation, but I saw something in you. I thought that you could grow into someone bigger and better than what's happened here.
>
> And hopefully, in the decade [sic] you're going to serve in prison, you will find such a person within yourself. Because where you've gone it's deep, it's dark, it's dangerous, you're a killer. And I agree with [the prosecutor], you don't seem to show any regard for that. You took a life. It wasn't an accident. It wasn't self-defense. You took a life. And you have so much potential. You're determined, you're smart, you're crafty, but you – it's gone for nothing and you, you took a life that will never come back. And you've hurt people. These people are hurting,

they're deeply hurting today. And I just, I don't know where that other part of you that I've seen in the past in court, where that person went. And I hope that, in all the time you're going to get, you got two choices, you can just go to prison and rot your life away or you can go to prison and find it in your heart to ask for forgiveness and to be a better person, inspire other people, do some great things within the walls of the prison system. Make some important decisions and try to find the best in yourself. Okay.

First off, I'm going to sentence you on . . . the [f]elony[-][f]irearm. Sentence is two years with credit for 463 days served. This must be served consecutively with and preceding the sentence [for second-degree murder].

[For] . . . the [h]omicide, I'm imposing a sentence as recommended [by the probation department] of 30 years to 60 years with the Michigan Department of Corrections. You have zero credit on that . . . as that is to be served after the [f]elony[-][f]irearm [sentence].

On the CCW . . ., I'll impose 463 days [in] jail with 463 days credit.

Thus, the trial court plainly considered defendant's potential for reformation, the protection of society, and the discipline of the offender when it sentenced her. See *Boykin*, 510 Mich at 183. In particular, the sentencing judge discussed how she saw defendant's potential in an earlier case, despite defendant's repeated probation violations; however, defendant's actions during this crime demonstrated she was "a killer."

On appeal, defendant contends that the statutory guidelines do not accomplish the Legislature's goal of reducing disparity in sentencing because the range applicable in this case is too wide. In defendant's view, the guidelines provided the court with "no real guidance in sentencing" defendant. But, the statutory guidelines did provide guidance, namely, they recommended a minimum sentence of 270 to 450 months or life for offenders who shared the Prior Record and Offense Variable Level scores that defendant had. See MCL 777.61.

Next, defendant argues that the guidelines failed to consider the mitigating circumstances of her background so the guidelines should be given little weight. Specifically, defendant notes that the Presentence Investigation Report (PSIR) reflected that her father had been accused of being abusive and that defendant had a large immediate family with several of her brothers being incarcerated. Even so, defendant had a high school diploma and had been steadily employed. Again, all of these matters were included in the PSIR for the court's consideration in imposing a proportionate sentence, but they did not outweigh the seriousness of her murder conviction.

Defendant suggests that if the trial court had imposed a sentence at the low end of the guidelines recommendation, it would have accomplished the goals of reformation, protection of society, punishment, and deterrence of others from committing like offenses. At sentencing, however, defense counsel argued for a bottom-of-the-guidelines sentence and the court determined that a higher sentence was warranted under the facts and circumstances presented in this case.

Finally, defendant asserts that she did "not deserve such a stiff punishment" because "there was very strong evidence that [she] acted in self-defense" and "that she was remorseful and never

set out to kill Mr. Newell." The jury, however, rejected defendant's testimony that she acted in self-defense. Instead, it convicted defendant of second-degree murder, which required a finding of malice. *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022). Again, "[m]alice may be established in three ways: by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. Further, the sentencing court expressed agreement with the prosecutor's contention that defendant had not demonstrated remorse despite her counsel's representation otherwise. On this record, defendant has not met her burden of showing that her within-guidelines sentence was unreasonable or disproportionate.

Affirmed.


/s/ Kathleen A. Feeney
/s/ Anica Letica